## HUGH JACKSON v. THE STATE.

### No. 147.   Decided May 27.

**1. Murder—Charge of Court—Defendant's Standpoint.**—On a trial for murder, where upon the question of self-defense the court instructed the jury, that they "*ought* to consider the situation and circumstances of the case from the accused's standpoint, as it appeared to him at the time," and it was objected that the court should have instructed the jury that they "*must*" do so, and not "*ought*" to do so: *Held*, there was no error, and the charge as given was sufficient.

**2. Same—Provoking Difficulty—Self-Defense.**—On a trial for murder, a charge in effect. that if a person committing the homicide provoked the contest with the intention of doing serious bodily harm to deceased, the offense is not reduced to manslaughter. but is murder, announces a statutory rule and does not destroy the right of self-defense.

**3. Same—Provoking Difficulty with no Intent to Kill.**—On a trial
for murder, a charge to the effect, that if a party, without any intention to kill,
brings on a difficulty and is compelled to kill to save his life, the killing, though
unlawful, *might* be manslaughter, and it was objected that the charge should have
instructed that such killing would not be murder, and might be manslaughter:
*Held,* that the charge is in the language of the decisions.

**4. Murder of the First Degree — Evidence Insufficient.** — See a
statement of facts which in the opinion of the court presents a case of evidence
insufficient to support a conviction for murder in the first degree, with penalty
assessed at imprisonment for life in the penitentiary.

APPEAL from the District Court of Williamson. Tried below before
Hon. W. M. KEY.

On his trial for the murder of George Meadows, appellant was con-
victed of murder of the first degree, with punishment assessed at a life
term in the penitentiary. In order fully to illustrate the grounds of
reversal, the evidence is reproduced in full.

The following is the evidence for the State:

W. D. Ake testified: Live about one mile from Hugh Jackson's place,
in this county. I knew George Meadows. He is dead. Saw him dead
in defendant's field, on land he had rented from defendant. (Witness
made a diagram on the floor of the premises.) The dead body was about
200 yards south of Meadows' house when I got there. He was lying
about four or five feet east of wagon. Wagon sheet was stretched over
his body, one end fastened to wagon. About 1000 yards from there to
defendant's house. Five days after I measured from the wagon to a point
about fifteen feet inside of Zanders' field, where Zanders' wagon stood,
and found it 307 varas. The body was lying parallel with the wagon.

Cross-examined: I got there just after 12 o'clock. Don't remember
for certain who was on the ground when I got there; several men there;
and several came afterwards. Am pretty certain that Jim and Lee Jackson
were there. M. L. Bolding, and think Clark Bolding and Mr. Roby, and C.
M. Moore were there. I was about one and a half miles away when I heard
of the killing—was at Fred Carl's house. Carl came and told us. I
went home and got dinner, and went over there. Think it was after 12
when I got there. Did not measure distance of wagon from Meadows'
house. There was a wagon at both places when measured to Zanders'
field. I made no mark on fence post, and never heard of any being made.
Measured it on 17th of September. Cotton had been picked there at that
time. Zanders and Styles assisted me in making measurement. Used a
surveyor's chain ten varas long. Don't remember the day of the week
the killing occurred. The cotton had been picked about 60 steps south
from the Meadows' wagon. Three or four rows picked about 30 yards
back from end of rows. Measured these distances same day measured to

Zanders' field. The branch separated cotton from corn in Jackson's field. The wagon tongue pointed east of north. I don't remember seeing cotton sack where cotton had been picked. Did not look for any the day of the killing. There is a hackberry tree in Jackson's field. It may be 700 yards or more from this tree to where the body lay. It was at least 700 yards, and expect more. Tree 500 or 600 yards from Jackson's house. Think between 10 and 11 o'clock that I heard of the killing. The day of the killing was quite warm. Don't remember the course of the wind, if any. The cotton rows in Meadows' fields run east and west, at right angles with the fence.

Redirect: Two roads from Meadows' to defendant's home, which could be travelled by wagon. Ran Blankenship lived then a mile and a half—probably two miles—in direct line from Meadows'. We made measurement to Zanders' field with J. M. Smith's surveyor's chain. I did not carry chain, but went ahead as a guide. The 12th September, bright and clear day; the 17th, dark, cloudy. On the 17th got up in Zanders' wagon and experimented. First stood in bottom of wagon bed and Zanders stood down at other wagon, where Meadows was killed. I could see his head and shoulders. I then stood on top of wagon bed, and could see Zanders down to top of pants. Where the killing occurred was in Williamson County, Texas, September 12, 1891. Mr. Meadows was not quite as tall as Zanders. It was a Fish Brothers wagon. I stood on front end of wagon pointed south. The Zanders wagon from which we measured and in which I stood was placed there by Emil and Minnie Zanders, at what they stated was the same place where their wagon had stood on the day of the killing; the wagon that was there on the day of the killing having been removed before we made the measurement.

William Meadows: I am George Meadows' son. He is dead. He died, I think, July 12. I was on wagon in our field on Hugh Jackson's place. I saw Hugh Jackson that day first time out in our field, about 100 yards from me. He was riding towards me and my father. George Meadows, my father, was then weighing cotton on the steelyards, and putting down weights in book with pencil. My father had the steelyard, weighing cotton with it. Defendant came up to where we were, and said, "Good morning, Willie." I said, "Good morning, Uncle Hugh." He is my uncle. He said, "Good morning, Mr. Meadows," and pa said, "Good morning, Mr. Jackson." Defendant then said, "Where is my rent cotton?" Pa said, "In smoke house." Defendant said, "You are a damned liar." Pa said, "You are another, and if you don't get away from here I will hurt you." Defendant got off his horse, and said, "Hurt!" and started towards pa, and pa backing, and pa ran his hand in his pocket. Then defendant said, "Drop it! drop it!" and pa said, "I won't." Then defendant shot him with a pistol, and he fell. After defendant started towards pa, I saw pa run his hand in his pocket, but did

not see anything in his hand. He backed six or seven steps before he was shot. He was on the side next to the Zanders farm when the difficulty occurred, and backed towards Zanders'. I was up in the wagon when the difficulty occurred. I don't remember whether the killing was in the morning or evening. I went after my two uncles, the Blankenships. My mother told me to go. When I got back, the body had been moved up near the wagon. When he was shot he fell about as far as from here to that wall from the scales where he was weighing cotton when defendant started towards him (pointing to a wall about 35 feet away). I think that same week I took some money from pa to defendant, and he said, "I can't settle without receipts. Tell your pa to send me the receipts, and I will settle." Defendant did not speak like he was mad. When I got back to the body from going after my uncles, a pistol was lying about two steps from his head. He was then near the wagon. When I went after my uncles I left defendant and mother with the body. Mother and I still live on defendant's place on Possum Creek, but not the same place where the killing occurred, about three miles away. I was standing up on the wagon, in which I had been emptying sacks of cotton, when my father was killed by defendant. At the time the shot was fired that killed my father the defendant's back was to me, and my father was facing me. When I carried the $5 to defendant, I carried him a note from my father about the rent.

Cross-examined: My grandmother, my mother, and my uncle Ben Blankenship are living together on one of defendant's places. I remember when defendant came over there a few days before the killing, and invited pa and ma and all of us to take dinner with him. I think he invited us to come the next Sunday. They were talking about ginning. They had no trouble; were talking about which was best to pay, money or cotton toll, for the ginning. They parted friendly. At the time of the difficulty my mother was picking cotton not far off. She was at the end of row, picking in apron. Defendant and Meadows were facing each other at time of difficulty. Scales not very far from wagon. Did not see my father's arm during the difficulty, only saw him put one hand in his pocket. I was looking at defendant nearly all the time of the difficulty. Did not see father's hands or arms up. Did not say so at examining trial. Defendant said, "Drop it!" only once. They were near each other, about eight or ten feet apart. Father said he would not drop it, and defendant fired his pistol, and father fell. Mother ran up at once, but I don't remember what she first said; nor do I remember what defendant first said after the killing. Defendant was on his horse when he and my father began quarrelling. Am certain of this. I think the killing was on a Saturday. Defendant came up in about ten feet of scales and stopped. Yes, I think just after defendant shot he said, "Drop it!" again. Said it but once before he shot. Only one shot fired. First time

I saw defendant's pistol was when he said, "Drop it." Had not seen it before that time. It was before that that I saw my father (Mr. Meadows) put his hand in his pocket. When father went away from home he usually carried a gun. He had a five-shooter pistol. The pistol I saw on the ground where the killing occurred was my father's pistol. I found his pistol once in his ducking pants pocket when they were hanging up. These were the pants he had on when killed. My mother came down to where the shooting occurred, in a run, when the shooting occurred. It was all done quick, very quick. I never saw Uncle Hugh's pistol until after I saw father run his hand into his pocket; and it was after father ran his hand in his pocket that Uncle Hugh said, "Drop it."

Redirect: At time Meadows ran his hand in pocket defendant was going toward Meadows, and Meadows was backing. The wagon and place where father was killed were about 300 or 400 yards from our house. When I got back there, after going after my uncles Jim and Lee Jackson, some of defendant's family and others were there. They had not visited our house very often. Had been there sometimes. Our house had two rooms in it—one bed room and kitchen. Father generally kept his pistol in trunk. I saw it in his pants pocket about a week or two before he was killed. I could not see it, but felt it in pocket, and found it. It was the same pants he had on when he was killed. Meadows' left eye was out. I think it was his left eye. Did not see my father take his hand out of his pocket. He was shot soon after he put his hand in his pocket: Put his hand in his pocket after defendant began advancing on him, but before defendant said, "Drop it." Saw Meadows' hands after he fell, but saw no pistol. I did not go up to where he was, and never examined to see whether he had a pistol or not.

Recross: I pointed out place where Meadows fell to my uncle some days after the body had been removed. I did not go to him when he fell, but went off right away to tell my uncles. I started just as soon as my mother came. She told me to go. My father fell when shot, got partly up, and fell again.

Emil Zanders: I am 16 years old. Knew George Meadows. He was killed in a cotton patch on Hugh Jackson's place, in Williamson County, Texas. Was killed about between 9 and 10 a. m. I was at wagon, close to fence between our field and defendant's. Wire fence between. The wagon was in the turning row, which runs up and down fence on our side, about ten feet from fence. Wagon had double side boards on, and was nearly full of cotton. First that attracted my attention was the words, "damn lie." I was weighing cotton at the time I heard it. I at once went up on the wagon to see what Mr. Meadows and Mr. Jackson were doing. When I got on the wagon I saw defendant get off his horse. Meadows was then at the scales near his wagon. Defendant then started towards Meadows and Meadows then stepped back, and defendant shot

him, and he (Meadows) fell. I saw no pistol, but defendant extended his right hand out towards Meadows, and I heard the pistol fire, and saw Meadows fall. Meadows had his back to me. I could not see his (Meadows') hands. After Meadows fell, defendant went back to his horse. William Meadows, deceased's son, was on their wagon when the shooting occurred. He got off the wagon, and went up towards Meadows' house. When Meadows was shot Mrs. Meadows was near by, picking cotton. She came to where Meadows fell at once, and then William Meadows left, leaving defendant and Mrs. Meadows there. Defendant stayed a while and left, going towards his house. Then defendant and Jim and Lee Jackson came to where the body was. Jim Jackson came back behind his father on same horse. Then I went over there where Meadows was. I went over there about half hour after the three Jacksons came back. Hugh Jackson (defendant) left again before I went there. He went the same way he went before. I got down the second time, and went straight over there. Jim and Lee Jackson were both there. No one else there except the dead man. His body was about three feet from the wagon. When I got there the dead man's body was not where I saw him fall. When I got there I saw a pistol about three feet from Meadows' body, lying on the ground. Jim Jackson showed it to me, and said, "There is Meadows' pistol." It was cocked; muzzle from the body. It was a bright, clear day, and I could see plainly. A person standing on the wagon could easily see the pistol where it was. It was in plain view. It was laying upon a cotton row, and could be seen plainly.

Cross-examined: The killing was on Saturday. Had been picking cotton about two hours. Had been picking cotton out there in that field about a week. Had moved wagon twice. Wagon was nearly full of cotton. No sheet on it. Picked more cotton that day. Finished the wagon full that evening, and took it home. Took wagon back to field next Wednesday, I think; am not certain about the time. Don't know if it rained Monday or Tuesday. That wagon was not out there Monday or Tuesday. Another wagon was there on Monday. Can't tell if two wagons were out there at one time; don't remember. I stayed down where the dead body was about fifteen minutes; then went back to work. I took the wagon home about sundown. Did not come back to field on Monday. Did Tuesday morning, and worked a while. We had the other wagon then in the middle of cotton patch. Tuesday the wagon had a sheet on it, near the middle of field. My father took this wagon off Saturday morning. The one that I got up on was carried there Friday evening by my father. The one I got up on at time of the shooting was carried out of the field that evening, and the other one brought in and left about 200 yards from fence. Had wagon in field Thursday; same one that I got on Saturday. I was along when Mr. Ake, Mr. Zanders, and others were measuring. Had same wagon there that I got on Satur-

day. My father brought it and put it in same place where it stood when Meadows was killed, and they measured distance to where the Meadows wagon was when he was killed. I and my sister showed the place to put the wagon. Next day my father said he marked a cedar post to show the place where our wagon stood. Said he cut it with a knife. I have seen the post. It is cut. Saw it last Friday. I was weighing cotton. While standing on the ground I could not see Meadows' wagon. When we heard the "damn lie" given we got up on tongue and went to middle of wagon. My sister got up first. When I got on the wagon I saw defendant get off his horse. I know it was him. I know the other man was Meadows. Stayed on wagon about fifteen minutes; I am not very certain, but think fifteen minutes. The killing took place, and Mr. Jackson was going off, before I got down. Saw defendant down there, moving around some. Saw Mrs. Meadows go there. Mr. Meadows backed about ten steps, and defendant followed him. Can't tell how far apart they were. Nothing there to obstruct my vision but the growing cotton. The cotton was about a foot or foot and a half high. I could see them down nearly to their knees. Defendant went off in a lope on horse, and I heard him hallooing as he went. He was going fast. I did not hear defendant halloo until he had ridden some distance and was behind some corn. That was down opposite our wagon. Did not see him have his hat in his hand and motioning with it. He got on his horse before I got off the wagon. When I got off the wagon I did not see him any more, but heard him hallooing. Don't remember for certain whether he hallooed before I got off the wagon or not. I got back on the wagon again, and saw Jim Jackson and defendant come back. I stayed on wagon a while, and then Mr. Jackson (defendant) left. Then Lee Jackson came, and I went over there. Saw pistol cocked and lying on the ground. Jim Jackson told me it was cocked. The cotton rows in Meadows' field extended up to our fence, a two-wire fence. I could not see what either Mr. Meadows or defendant had in their hands. They told me it was 293 yards from one wagon to the other. Mr. Ake told me so. I saw them measure it. Measured from our wagon to Meadows' wagon. I saw the pistol lying on the ground, and know it was cocked when I saw it. I had no timepiece, and only guess at the time, and also as to distance that Meadows stepped back, as his back was toward me. I can only give my opinion and impression as made upon me at the time. There was a hill or swell between where I was and where Jackson and Meadows stood, but, standing upon the cotton in the wagon where I was, I could see what I have described.

Redirect: Don't know how many posts were there like the one marked. I know that my sister and I showed where the wagon was, and father placed it there, and they then measured the distance between them, as I said. I left the two Jackson boys with the body. No one else had come

then. Mr. Jackson was out of sight when, he hallooed. Don't know how far off.

Recross: The post is a few cotton rows from the corn in the Jackson field; that is, it is opposite two or three cotton rows from corn. I could not see the hands of Meadows, and do not know whether he had a pistol in his hand or not. At the time Jackson shot him his back was to me, and he was between me and Mr. Jackson.

Miss Minnie Zanders testified: I remember the time George Meadows was killed. He was killed in Williamson County, Texas, on the 12th day, I think, of November, 1891. Defendant shot him in cotton field. I was up on a wagon in our cotton patch. We were weighing cotton, and heard some one say, "damn lie." My brother and I got up on our wagon, and looked and saw defendant getting down off his horse. He then went towards Meadows, and Meadows went backwards, and defendant shot him, and he fell. Shot him with a pistol. Saw it by the smoke, and heard the shot. Mrs. Meadows was near by, picking cotton. After Meadows fell she went there. Saw Mr. Jackson (defendant) moving around some, but don't know what he was doing. Then defendant went off towards Meadows' house on horseback. He went running his horse. Before he (defendant) went off the Meadows boy left. He was upon the Meadows wagon when Meadows was shot. Don't know how near Mrs. Meadows went to the body of Meadows. After defendant left, the next person that came was defendant, and Jim Jackson behind him on same horse. Then, soon after, Lee Jackson came. We got down then and weighed our cotton. Then got up again and looked down there. Saw a woman come. Did not know who she was. Don't know how long we stayed on wagon; maybe half hour. My brother went down there soon after we got off the wagon the last time. It was a bright, sunshiny day.

Cross-examined: Think the killing was on Saturday. Think 12th of November. It was in the morning. We had been picking cotton about an hour and a half. My brother got on wagon first. Think we stayed on wagon about half hour. Am not certain. Defendant got on horse. Went off towards Meadows' house in run on horse. After he started off did not hear him hallooing. We got back up on wagon, and saw defendant coming back with Jim Jackson behind him on same horse. I got off the wagon then, and don't know if defendant left right away again or not. Don't remember if Emil got off right away or not. We picked cotton until dinner. When we got off wagon, Emil went down to Meadows' wagon, where the dead man was. He stayed a few minutes and came back, and we went to picking cotton. Our wagon was near the fence. The shooting was quick. I have not been out there to see marked post. My father knows of the marked post. I never saw it. He told me that he marked a post where wagon stood. Mr. Blankenship came to our house last Thursday, and wanted me to go and show where wagon was,

and I refused to do it, because I did not want to. Think it was nearer from our wagon to Meadows' wagon than to Meadows' house. Did not see Meadows' hands when shot, nor hear what they said. Saw defendant put up one hand just before he shot. Did not see pistol. Could see them — the men — down about to their knees. While standing on the ground we could not see them. We could see the boy on the wagon. I knew it was the Meadows boy. Did not see his face. Did not see George Meadows' face. Knew him by his back. It was between 200 and 300 yards. Defendant had his face toward me; could see it some; could see his beard; could not see his nose, eyes, and mouth. Could tell it was Mr. Jackson. Knew him on his shape. All happened quick. When I first got on wagon I saw defendant getting down from horse. Meadows was facing towards defendant. Could not see Jim Jackson's face when he came up. Knew him by his shape. Lee Jackson came afoot on left side of Meadows' house. Don't know which side of the house defendant came up on. First time stayed on wagon about half hour. Don't know how long second time. When Lee came up he went in fifty yards or nearer to our wagon. Saw his face. Did not see defendant go off second time. I got on wagon second time to empty cotton, and did not look to see if defendant went off second time. My brother was on wagon second time, too. I could not and did not see Mr. Meadows' hands at the time of the shooting, and do not know whether he had a pistol in his hand or not. His back was to me. Could not say whether he had his hand pointed toward the defendant with pistol in it or not at the time defendant shot him, and could not see Mr. Meadows on the ground after he fell.

Redirect: Have known defendant and his sons for last ten years. We have never had any trouble. Always been friendly. I knew it was Meadows when I saw him fall, and knew it was defendant who shot him and rode off.

Jack Gollahon testified: I now live in Coleman County. September 12, 1891, I lived near defendant's place. I knew defendant and George Meadows. I remember the circumstances of Meadows being killed last year. Think he was killed on Saturday. On Monday or Tuesday before that I saw defendant at his house, and he told me he and George Meadows were at outs.

Cross-examined: Defendant did not make any threat or use abusive language; did not speak harshly of Meadows, or in a mad way. Simply said they were at outs.

Redirect: It came up in this way: Meadows' boy had brought some money for defendant, and after he left defendant told me that he had brought a sack of corn from mill for that Meadows boy, and let him ride in his buggy. Thought he would not have done so for George Meadows, as they were at outs.

J. M. Smith testified: Have known defendant ten or twelve years.

Remember the occasion of George Meadows being killed. It was on a Saturday in October, I think. On the day before the killing, defendant came to me at the gin and said he wanted to look at gin books, and see how many bales of cotton Meadows had ginned. I told him I thought it was only one bale. He said he thought it was two. We looked, and found it was only one. Defendant said he could put Meadows into the " pen " or " jug;" used both these terms several times, and appeared to be angry. He seemed to get more and more excited, and finally said he would " settle with the damned dirty scoundrel." Said this, in substance, several times, and think he called Meadows a damned dirty dog once or twice. I told him I thought he was mistaken; that I did not think Meadows had sense enough to cheat or swindle him if he wanted to; and that I thought Meadows would do what was right. Told him I thought Meadows was very simple-minded, and was to be pitied. He seemed then to quiet down, and said, yes, he was to be pitied, and that he was sorry for him, and spoke in a sympathetic tone.

William Meadows, recalled, for State: On the day Meadows was killed no one was left at our house except the baby, about five months old. At the time of the killing no one was at our house except baby.

Cross-examined: I ran my horse over to my uncles', and they came at once. I first had to go and get my horse. It was staked out about 300 yards off. Don't remember what day I took the money to defendant. I took $5. The defendant refused to take the money.

Colman Moore testified: Live about one mile from where George Meadows was killed. I went down there. Got there in the morning; might have been 9 or 10 o'clock. I was half or three-fourths mile off. Jim and Lee Jackson were there. My brother and Taylor Bowen went together. The two Blankenships got there just as I did. Saw a pistol lying in about three feet of the body. It was cocked. Jim Jackson called my attention to it. This was Saturday, September 12, 1891, in Williamson County, Texas. A person standing in the wagon could see the pistol on the ground. It was in plain view, unless a person was standing behind the wagon sheet put up to shade the body.

Cross-examined: Don't remember if the Blankenships came on wagon; may have. There were two of them and a man named Hair came together. Think we all got there at same time. Think pistol was in three or four feet of dead body. I did not measure the distance. I went home and got dinner, and went back. Several people were there then. The body had not been moved then. I think Ben Blankenship left before I did. Defendant came before I left. Think Mr. Carl came with him. Don't remember if I left defendant there or not. The officer and people from Corn Hill came after I got back. I remained, second time, until after the inquest was over. Think Meadows was shot in left side.

Dr. Armstrong testified: Am a physician. At solicitation of the justice

of the peace, I went and examined the body of George Meadows. He was shot on left side, to the left and a little above the left nipple. Where it struck the skin the abrasion was half an inch or more before the ball entered the body, showing that it came from the left of the deceased. Its range was towards the heart. I think this gunshot killed George Meadows, though I did not probe it, and did not examine the other side of the body to see if the ball came out.

The following is the evidence for defendant:

Ran Blankenship testified: Knew George Meadows. His wife and defendant's wife are my sisters. George Meadows was killed Saturday, September 12, 1891. Billy Meadows came and told me, and I went at once. My brother and Mr. Hair went with me. We went as fast as we could. Met defendant at his gate. When we got there Jim and Lee Jackson were there. Ben Blankenship went to Corn Hill after officer to hold inquest soon after that. Don't remember where the matter of sending for justice of the peace was first mentioned. Colman Moore, Jack Moore, and Bowen got there about same time I did. Defendant and Mr. Carl came next. I then went to Bartlett. I set a stake where William Meadows said the dead man fell, where scales were, and where wheels of the wagon were. I was there last Thursday. Mr. Page and William Morris were with me. I pointed out the stakes to them, all of them. I remember seeing a cotton sack about thirty yards from end of the cotton row. It was sixty rows from the body. The hack driver, my brother, and myself counted them. Corn south of the cotton. Cotton picked in nine or ten rows of the corn. The sack was lying between two rows, and cotton had been picked from west end up to the sack. Last Thursday I found a sound cedar post with three marks near center wire on fence dividing the Jackson and Zanders fields. I went to get Miss Minnie Zanders to show us where the wagon was standing on day Meadows was killed. She refused. I learned from her that a post had been marked near where the wagon stood, where the boy pointed out as where the body lay when I first got there. I saw a pistol lying on the ground near the dead man, cocked, and about two steps from where Meadows lay, near the wagon, on day of killing.

Cross-examined: It was the 14th day of September, 1891, that I marked the place where the body was, and where the wagon stood, etc. I have never communicated this information to the State. Did not put these marks there at the request of the defendant. I went down there to get the wagon and to mark the place where it stood and where the body and scales were. Don't know who paid Mr. Page to make the measurements. Ben Blankenship was with us when I drove down. The east wheels stood barely on cotton rows, and west wheels on the grass. Kelihor's pasture joins defendant's field on west. Jackson had corn next to Kelihor's pasture. I noticed where horses had been fed in Kelihor's pasture, near

Jackson's.   Looked like had been fed a couple of bushels, from the number of cobs.

Witness, recalled next morning, said he wanted to make an explanation of his testimony, and said, after studying it over, he remembered that William Meadows was not with him when he drove the pegs at wagon and where body was.   Says now the body was not there at that time, but that a few days after he asked the boy to show him where his father fell, and that he pointed it out about where I had driven the stake to mark the spot.   I went to Bartlett on Saturday evening to get a coffin for Meadows.   I drove the stobs down below surface of the ground, to conceal them, so they could not be moved.   When we searched for them last Thursday, when Mr. Page and W. W. Morris were present, the dirt had been washed over them, and we dug up the ground to find them, and we found them where I had placed them.   Ben Blankenship suggested the staking of the ground to me.

Ben Blankenship testified:   Going to Meadows' after we heard of the killing, we went in fast trot.   Got there about 9 or 10 o'clock.   Am not at all certain about time.   Saw the pistol.   The dead man was then lying with head near front wheel of wagon.   The pistol was off to his right, about as near his shoulder as his feet, and about six feet from where we drove the stob as the place where he fell.   The pistol was cocked. Saw where somebody had been camping in Kelihor's pasture.   Saw cobs, as if horses had been fed.   Saw this on Tuesday after the killing.   Balance substantially as Ran Blankenship's evidence.

Cross-examined:   Did not notice two rails lying across each other; about a bushel or a bushel and a half of cobs; that is, I mean cobs enough to have been that much corn.   I just suppose that much.   Did not pay much attention to them.   Jim Jackson called my attention to the pistol. I did not drive the stakes, but helped my brother to do it.   Jim Jackson was there, but did not help any.   I am certain that he was there.   Think we drove one where pistol was.

Redirect:   We drove stobs at wheels of wagon, and where the dead man fell and the scales stood.   It was late Monday evening that we did this.   Jimmie Jackson had been to town that day, and came home and told me that Colonel Makemson, defendant's attorney, wanted the place where the wagon stood, and the place where the scales stood, and the place where the pistol lay, and the place where Mr. Meadows fell, all marked, so we could tell exactly the place.   My brother Ran was talking about moving the wagon, and I proposed that we go and mark the place first.   I did not tell that Colonel Makemson wanted it done.   I remember that I prepared the stobs, and I think Ran drove them in the ground. The wagon and scales were still on the ground when we drove the stobs, and the stobs we unearthed when Page, Morris, and others were present last Thursday were the ones we drove, and were in the place that the

wagon and scales occupied when Meadows was killed. Hugh Jackson, the defendant, sent me to Corn Hill after officers to hold inquest over the dead body. He told me he wanted the justice of the peace to come, and I went. I have told the Meadows boy to swear the truth. Never told him anything else. Have never tried to influence him in the least. He and his mother live with me on Possum Creek, on land I have rented from the defendant. Defendant does not contribute to their support in any way.

Jim Jackson testified: Am defendant's son. I am 24 years old. Mrs. Meadows is my stepmother's sister. Meadows was killed on Saturday. I was picking cotton 600 or 700 yards off. I first heard hallooing, and looked up and saw defendant coming on horseback, loping, and waving his hat. I could not then understand what he said. I pulled off my cotton sack and ran and met him. He was running as fast as his horse could run. I got up behind him, and we went back as fast as we could to the wagon where Meadows was. We went in a run. Lee Jackson was about twenty-five steps behind me, picking cotton. I was about twenty-five steps from hackberry tree. When I got there the pistol was pointed out to me on the ground, when I rode up by my father. I saw it on the ground. When people came I called their attention to it. I did not go to Meadows' house; and my father in going after me, and we in going back, did not stop at Meadows' house. When we got to the wagon Mrs. Meadows was sitting by the off wheel, crying. She then went home. I was in town Monday after the killing. Colonel Makemson told me to have the ground staked—location of wagon, scales, etc.—and I went with Ben and Ran Blankenship, and they staked the ground. Think Ben drove the stakes. Am not certain. It was late in the evening, but we could see. They found where something had been dragged, and located where Meadows fell by that, and drove stake for it; one at scales, and one at each wagon wheel. Don't remember if one for pistol or not. Saw cotton sack four or five rows out from corn. It was not very far from west end of rows. Saw it there the day of the killing. Could see it from the wagon. When defendant came back the second time, Mr. Carl came with him. The pistol was not moved until the inquest. When defendant got me in cotton patch he told me he had killed Meadows, and said he had to do it to save himself; that Meadows had a pistol drawn on him when he shot him.

This was all he told me at this time, except to get up behind him, and go down there to the place of the killing with him. When we got there he told me to stay there, and see that nothing was moved or changed until the inquest came. He put Lee Jackson on a horse, and sent him after Mr. Zanders and Bill Harrison, with request to come to him at once.

Cross-examined: The pistol was in plain view. Could be seen unless person was behind the wagon sheet. When I called persons' attention to

it I told them not to move anything. I was picking cotton about 150 yards from west fence, on high ground. The tree was about 250 yards from that fence. Lee was not at the tree. He was not picking cotton right where I was, but was not far off. I saw the cobs, etc., down in pasture near kitchen gate. I could see my father from above the Meadows house. I saw him as he come riding and calling to me between the Meadows wagon and Meadows' house. I ran to meet him.

J. M. Page testified: Am a surveyor. Have good compass and chain. Last week I went out to defendant's place, and did some surveying. Defendant and his two brothers, two Blankenships, found a post marked three hacks on Zanders' side, east side. It is opposite fourth row of cotton after leaving corn. Estimated distance from Meadows' house to Meadows' wagon at 1100 feet. Gave details of his measurements on the ground, and exhibited plat showing these distances, courses, etc., in full.

The district attorney admits the post on the 960 foot line testified to by J. M. Page, as being marked by Mr. Zanders, as showing where the Zanders wagon was when the killing occurred, and the place where the Zanders boy and girl were when the shooting occurred.

W. W. Morris testified: I heard of the killing of Meadows, and went with the justice of the peace as one of the jury of inquest. When we got there, the dead man was lying by the wagon, feet turned a little northeast; wagon sheet up over him on a pole; pistol lying on cotton row east from the dead body, five or six feet from the body, cocked. (Witness shows a plot made by himself. Distance from wagon to where scales stood, nine feet and six inches.) A stake was pointed out to me as showing where dead man fell. The distance from the stake set for scales is nine feet and four inches to where dead man fell, where a stake was found. The distance to wagon wheel was fifteen feet four inches from where dead man fell. Lum Jackson picked the pistol up. I saw him do it. He was on the jury. It was loaded and cocked. Lum Jackson handed it to Jim Shaver, and he uncocked it. He had difficulty in letting the hammer down. Lum Jackson tried, and could not. Defendant was there when I got there. No officer there then but the justice of the peace. Defendant was not under arrest. He voluntarily went with us to Corn Hill. Heard defendant say he was ready to do anything the justice of the peace wanted him to do. It was last Thursday, I think, that I went out there and carried chain for Mr. Page. Could not tell whether Page said " up " or " down " when half the way between the wagons where the wagons stood when Meadows was killed..

The Meadows and Zanders wagons were gone when I went to where dead man was. East wheels of the wagon were in cotton. Think other wheels over on the grass. Saw broken bolt on the ground where wagon stood last Thursday. Think stakes for wagon wheels were somewhere about where I saw the wagon on the day of the killing. There was a

branch there, used as a turning row between Meadows' cotton and Jackson's corn, and wagon stood east side on ends of cotton rows, and west wheel on the grass in turning row. I made the measurements between the stakes where wagon stood and scales, and where the dead man fell, and from where dead man fell to wagon, on last Thursday, and the distances are stated above.

Cross-examined: Yes, think the stake for scales was in ten feet of where the scales in fact stood. Can't swear that it was in eight feet.

Redirect: Jackson, when the inquest was over, said he was going to Georgetown, to surrender to Sheriff Olive. I advised him to go to Corn Hill; that the justice of the peace said so; and he said, "All right," whatever he said to do he would do. When the justice of the peace and the jury of inquest came, Jackson said he was glad we had come.

Jim Shaver, testified: Am 29 years old. Born and raised in Williamson County. The day Meadows was killed I was at Corn Hill. I went down there at request of Esquire Richardson. Saw the dead man. Head near front wheel of wagon. A few feet from him was a pistol. Wagon sheet up over him. Don't remember about the scales. Pistol four or five feet from dead man, a little south of east. The pistol was cocked. The pistol was on top of cotton row, and was cocked. Cotton was growing on the land, and about two and a half feet high. I had the pistol in my hands. I let the hammer down. It was very hard on trigger. It was a five-shooter, and was loaded; a bright-looking pistol. Defendant went with us back to Corn Hill. Heard him offer to surrender to Esquire Richardson. He was arrested at Corn Hill. Don't know what time of day he was arrested; think late in the evening. It was with difficulty that I let the hammer of pistol down. L. C. Jackson tried and could not. I think it was on account of rust.

Cross-examined: Saw nothing to prevent seeing pistol. Pistol looked rusty, and I suppose that was what made it hard to let hammer down.

Richard Kuen testified: A few days before Meadows was killed, some men came and wanted to get to put some stock in pasture adjoining defendant's place. I saw after that where somebody had camped down there and fed corn near gate leading from defendant's place into pasture. Defendant told me somebody was stealing his corn, and he was trying to find out who did it; and inquired if I knew the names of the parties who put stock in the pasture. I told him they traded horses with a German, who probably could give name. He told me he was going to try to find out who they were. This was early in the morning before the killing.

Cross-examined: I told defendant the parties were travelling horse traders.

Lee Jackson testified: The day of the killing I was picking cotton in field, about twenty-five yards from brother Jim. First I knew of it, saw defendant on a horse, running as fast as he could towards where we were,.

and motioning his hat. Jim and I ran to meet him. Jim got to him first, and got up behind him, and they went back as fast as they could. Jim ran about 100 yards before he got to defendant. I followed them on, and when I got there defendant sent me after Mr. Harrison and Mr. Zanders. Did not find either of them. He wanted them to come over there at once where the killing occurred. I first saw my father coming in a run on horse, between Meadows' house and the place where he was killed.

Cross-examined: I saw no part of the difficulty, and don't know how it happened.

Hugh Jackson, defendant, sworn for himself by judge: I was born in 1837. George Meadows was my brother-in-law. He was renting land from me in 1891. The day before I saw the shucks, corn cobs, etc., near the oats in the Kelihor pasture. I saw signs of horses. I suppose there had been ten or fifteen horses fed there. Looked like 1½ bushels of corn had been fed. I went on to Bartlett, and came back by gin, and saw Mr. Smith. The agreement between Meadows and I as to rent was that the cotton was to be ginned and baled, and I was to have one-fourth and pay one-fourth of expense of ginning it. I had stood for stove at Atkins, in Georgetown, and for $20 in goods at Deering's store. I had last seen Meadows on Tuesday before that. We talked about paying gin toll. I said I was going to pay cotton toll. He said he thought it best to pay money. I was referring to my own cotton. We parted friendly, and I invited them down to take dinner the next Sunday. As to conversation with Smith, I asked him if he had time to show me from the books how much cotton Meadows had ginned, and told him if he had time to look and see; and he showed me. When I said I would settle with Meadows I had reference to settling about the cotton, and did not mean that I expected to have any personal difficulty with him. I meant money settlement. Next morning I saw Richard Kuen, and asked him the names of the men who camped down in the pasture. He asked if they had been getting away with my corn, and I said, "Yes, they had been helping themselves." I then went to the field. Took my pistol in my pocket. Did not take it to hunt Meadows; never thought of him. Took it because I thought I might find the men who had been getting my corn, and have trouble with them. I had seen the day before that somebody had been taking my corn. I did not know Meadows was at home. I did not know where he was. When I left home to go up in the field that morning, I went from my corn field on to where Meadows was picking cotton. When I rode up I said, "Good morning, Willie; good morning, George;" and as I said this I got off my horse, and threw the reins down, and stepped round to where Meadows was, and stumbled over wagon tongue in crossing it.

Think Meadows was putting something down in a book at the time I

rode up. I said, " George, where is my rent cotton?" He said, " It is in the smoke house." I said, " That is no place for it." He said, " You are a damned liar." I said, " You are another." He jerked out his pistol, and threw it down on me. I said, " Drop it, George." He said, "I won't." I told him again to drop it, and he said he would not. I then pulled out my pistol, and jumped to the right and shot him. He fell, and then raised partly up, and fell back again. Mrs. Meadows ran up screaming, and said, " You have killed my husband, and you shall suffer for this." I said, " Laura, I had to do it to save myself." I went to Meadows and raised him up, and tried to give him water to drink. He could not drink. I then bathed his face, and then moved him to wagon, and put shade over him. Then got on horse and ran after my sons. Got Jim, and brought him back behind me on horse. Went as fast as could run. Did not stop at Meadows' house. Sent my son Lee after Mr. Harrison and Mr. Zanders. I staid until after inquest. Told justice of peace I was willing and ready to do anything he wanted me to do. I told Burk I was going to Georgetown, to surrender. Will Morris said I had better go with them to Corn Hill, and then surrender, and I did so. Was arrested about sundown that day, and brought to jail, where I remained until 20th of October, I think. I knew nothing of the ground being staked until after I got out of jail. I was about five or six feet from Meadows when I shot him. I went there without any malice or ill will toward him. We had always been friendly. I had nothing against him. As to talk with Gollahon, I overtook Willie Meadows with sack of corn, and I took it in hack, and took him in. He opened gate for me on the road. A day or two after that Gollahon came to my house, hunting for sack of corn. I told him it was not my sack I was hauling, but was Meadows'; that I was hauling it for the boy. Did not tell him that Meadows and I were at outs. He must have misconstrued me. I have no recollection of saying anything of the kind. He certainly misunderstood what I said or meant to say. When I moved Meadows from where he fell to the wagon I put my arms around his body under his arms, and carried him, his feet dragging on the ground.

Cross-examined: Yes, I was surprised when Meadows got mad that day. There was nothing between us, so far as I knew. No, Meadows never told me that he had been to see Esquire Starnes to have me put under a peace bond. No, we had not quarrelled. I did not tell Mr. Smith that Meadows was a damned dirty dog. He called him a dirty dog, but I don't think I did. Don't think I said I could put him in a " pen " or " jug." I did not call him a damned dirty rascal or dog. I did not say he laid himself liable to the law by selling the bale of cotton without paying the rent and for the supplies I had furnished him. I was not mad when talking to Smith. I always talk loud.

I did not take the $5 Meadows sent me because I had not got the receipts

on returns showing the weights of the cotton. If I told Gollahon that Meadows and I were at outs, I do not remember it. I don't count that we were at outs at all. Yes, I say seriously, that I took the pistol because I thought maybe I would see the men who took my corn. I went through the edge of my corn before I got to Meadows'. I intended to go on down into the corn field. I got off before I asked him about the rent. I came in about 100 yards of his house in going to where I met Meadows. I got down to have a friendly talk with Meadows about the rent cotton. I asked him where my rent cotton was. He said, "It is down in the smoke house." I said, "That is no place for it." He said, "You are a dog," or "damned liar," I am not sure which. I said, "You are another." He then jerked out a pistol and pointed it at me. I said, "George, drop it." He said, "I won't do it." Then I jerked my pistol, and jumped to one side, and shot him. He fell, then raised partly up, and fell again. I went to him, and lifted him up, and spoke to him. He did not answer me. He was dead in a few minutes. I saw the pistol. It fell from his hand near where he fell. It was in plain view. Meadows did not back from me, and I did not follow him up and shoot him. I did not advance on him. We were standing still when he drew his pistol and threw it down on me. I don't know which pocket he drew it from, but looked like from hip pocket. He had just finished weighing cotton, and was ready to put sacks up in wagon when I spoke to him, and asked about rent cotton.

Redirect: The first time I ever heard of Meadows trying to get a peace warrant for me was at the examining trial before Justice Starnes. I never drew my pistol until Meadows had his out and on me. Mine was in my pocket, while his was out and drawn on me. I shot him to save my own life. I thought he was going to shoot me. If he had not drawn his pistol and tried to shoot me I would not have shot him, and if he had dropped his pistol when I told him to do so I would not have shot him. I thought and believed at the time he was going to shoot me, and that I had to shoot him to save my own life. That is the impression his conduct made upon my mind at the time, and I acted on that belief and to save my own life.

*Makemson & Robertson*, for appellant.— 1. The trial court erred in the charge given to the jury, in the second subdivision of paragraph 7, in which they are instructed that they "ought to consider the situation and circumstances of the case from the accused's standpoint, as it appeared to him at the time." Appellant insists, that under the law it was the duty of the court to instruct the jury that they must consider the facts and circumstances of the case from the defendant's standpoint. Brumley v. The State, 21 Texas Cr. App., 223; Bell v. The State, 20 Texas Cr.

App., 445; Patillo v. The State, 22 Texas Cr. App., 586; Gonzales v. The State, 28 Texas Cr. App., 135.

2. The court erred in the sixth subdivision of paragraph 9 of the charge, wherein the jury were instructed, that " if the person committing the homicide provoked a contest, with the apparent intention of killing or doing serious bodily injury to the deceased, the offense is not reduced to manslaughter, but is murder." Appellant insists, that this is not a correct statement of the law applicable to this case, and should not have been given to the jury, for the reason that it is misleading, and destroys his right of self-defense; and as given it makes his intention depend upon and be determined by appearances.

3. The court erred in the seventh subdivision of paragraph 9 of its charge, wherein the jury were instructed: " If the person committing the homicide provoked a contest without any intention to kill or inflict serious bodily injury on the deceased, and the deceased, by the use of a dangerous or deadly weapon, was about to inflict serious bodily injury upon or take the life of the person provoking the contest, and he killed the deceased to protect himself, then the killing, though unlawful, might be reduced to manslaughter." Appellant insists, that this charge is erroneous and misleading, in that it fails to distinctly define the character of the contest provoked; and further, that it is not the law applicable to the case made by the statement of facts enumerated by the court. That it is defective in failing to tell the jury distinctly, that under such state of facts the killing, though unlawful, would not be murder, but might be manslaughter. White v. The State, 23 Texas Cr. App., 162; Jones v. The State, 17 Texas Cr. App., 611.

4. Appellant insists, that this case should be reversed, because the facts in proof do not warrant a conviction of murder in the first degree, there being no evidence of express malice.

*R. L. Henry*, Assistant Attorney-General, for the State. — Appellant's main contention, and the only real question in the record, is, that the court did not properly charge the law applicable to an imperfect right of self-defense. The charge of the court completely covers such phase of the case. The rule, as laid down by a number of decisions, is, that if the defendant provoked the combat, or produced the occasion, in order to have a pretext for killing his adversary or doing him great bodily harm, the killing would be murder, no matter to what extremity he may have been reduced in the combat. But if he provoked the combat, or produced the occasion without any felonious intent, intending, for instance, an ordinary battery merely, the final killing in self-defense will be manslaughter only. The decisions only require that the court shall plainly draw the distinction between these two kinds of homicide where a combat is provoked. The charge clearly does so, and, taken as a whole,

covers every phase of the case made. Hollis v. The State, 8 Texas Cr. App., 620; Green v. The State, 12 Texas Cr. App., 445; King v. The State, 13 Texas Cr. App., 277; Smith v. The State, 15 Texas Cr. App., 338; Cunningham v. The State, 17 Texas Cr. App., 89; Cartwright v. The State, 14 Texas Cr. App., 489.

It is further stated, that there is no special instruction asked by appellant on the imperfect right of self-defense, and there is no bill of exceptions taken to the charge of the court on this phase of the case, in regard to self-defense. In view of these facts, the appellant can not avail himself of any technical defect that might be in the charge. Davis v. The State, 28 Texas Cr. App., 542.

SIMKINS, JUDGE.—Appellant was convicted of the murder of George Meadows, and sentenced to imprisonment for life, from which judgment he appeals to this court.

1. Appellant complains of error in the charge of the court, in this, that the court instructed the jury, that upon the question of self-defense, " the jury *ought* to consider the situation and circumstances of the case from the accused's standpoint, as it appeared to him at the time." Appellant contends, that the court should have instructed the jury that they *must* do so, and not " ought " to do so. There is no error. A jury of ordinary intelligence knows that it is their duty to receive the law from the court, and would never distinguish between " must " and " ought " or " should " in discharging that duty.

2. Appellant further objects to the charge instructing the jury, that if the person committing the homicide provoked the contest with the intention of doing serious bodily injury to the deceased, the offense is not reduced to manslaughter, but is murder; because it destroys his right of self-defense. There is no error in the charge. It was the statute, and applicable to the facts.

3. Appellant further objects to the charge instructing the jury, that if any person, without any intention to kill, brings on a difficulty, and if compelled to kill to save his life, " the killing, though unlawful, might be reduced to manslaughter." It is objected, that the court ought to have instructed the jury, that the killing would not be murder, but might be manslaughter. The charge is in the language of the decisions. Willson's Crim. Stats., sec. 1024; Green's case, 12 Texas Cr. App., 449, 450.

4. As to the sufficiency of the testimony to sustain the verdict, we can not say that it is sufficient. Appellant was the landlord and brother-in-law of the deceased, and appellant had gone his security with merchants to enable him, the deceased, to buy a stove and other things. While the crop was being gathered, appellant suspected the deceased was getting away with the cotton. Deceased had sold a bale of cotton, and had sent appellant $5 of the proceeds, which he had declined to receive. Appel-

lant was suspicious and angry, and spoke in bitter terms about the deceased to the ginner, who expostulated with him, saying that the deceased could not help it, as he was of no account. Defendant agreed with him, and remarked that deceased was to be pitied. Next day, defendant having armed himself, rode to the field where deceased was weighing cotton and asked for his cotton. Deceased replied, "In his smoke house." Defendant evidently doubted it, and said it was a damned lie. Deceased became angry, and replied, "You are another, and if you don't get away from me I will hurt you." Defendant then jumped off his horse, and said, "Hurt." Deceased drew his pistol and began backing. Defendant immediately advanced on him with his pistol drawn, crying, "Drop it." Deceased replied, "I won't," and defendant fired, and deceased fell and died in a few minutes. The wife of deceased, who was picking cotton a little way off, ran up, charging him with the murder of her husband. It was shown at the trial, that she was then living on one of the defendant's farms, and did not appear against him. When other parties arrived on the ground, a cocked pistol belonging to the deceased was found. It was shown that the body had been dragged by the defendant some six or eight feet from where it fell to the wagon, and covered with a sheet by the defendant. The son of the deceased, who was present at the homicide, was the principal witness against him.

We have given the case most careful investigation. The vital question is, does it appear from the record with reasonable certainty that the appellant went into the field with a premeditated and formed design to kill the deceased, and by deliberately insulting him, brought on the difficulty for that purpose? If so, it would be murder in the first degree, and the conviction should be sustained. We think there is but little doubt that he went over to investigate the cotton question, for he thought he was being defrauded, and that he armed himself for the possible difficulty. Yet we think there are strong grounds to believe that when he declared the deceased's statement to be a damn lie, it was because he thought so, rather than to bring on a difficulty to kill deceased; and the fact that he made no effort to draw his pistol until the deceased first drew his and began backing from him, and that he then told deceased to drop his pistol, and only fired when deceased refused to obey, strongly suggests that the homicide is to be attributed to sudden uncontrollable passion caused by deceased's conduct at the time, rather than a previously formed design to kill; and, if so, it would be murder in the second degree. Bonnard's case, 25 Texas Cr. App., 197.

We prefer that this question should again be passed upon by a jury. The judgment is reversed, and the cause is remanded.

*Reversed and remanded.*

HURT, P. J., concurs. DAVIDSON, J., absent.