# TYLER TERM, 1901.

## CRICKET CARSON v. THE STATE.

### No. 2353.  Decided October 30, 1901.

**1—Murder—Manslaughter—Charge.**

On a trial for murder where no specific act is shown authorizing a charge upon manslaughter, a charge on that issue is sufficient which, though general in terms, authorized the jury to find defendant guilty of that offense if, at the time of the homicide there was any act or provocation which, in the light of all the circumstances, rendered defendant's mind incapable of cool reflection, and under such conditions he slew deceased.

**2.—Murder in the Second Degree—Evidence Insufficient.**

See facts stated for evidence held insufficient to support a conviction of murder in the second degree.

Appeal from the District Court of Lamar.   Tried below before Hon. Ben H. Denton.

Appeal from a conviction of murder in the second degree; penalty, fourteen years imprisonment in the penitentiary.

The indictment charged appellant and Jim Carson jointly with the murder of Sip. Ross, on the 25th. day of December, 1900, by shooting him with a gun.   At the trial Jim Carson was acquitted.

It appears from the evidence that the parties had had previous difficulties and perhaps a law suit.   They had made serious threats against each other.   Deceased was drunk the day before he was killed.   He was killed at night out in the lane close to his horse lot; and after the killing his gun was found some ten feet from his body with an exploded shell in it which had recently been discharged.   There were no eyewitnesses present at the killing except the parties, viz., Crickett Carson, appellant, and his brother Jim and the deceased, Sip. Ross.   Defendant testified at the trial, and his testimony is corroborated by that of his co-defendant, Jim Carson.

Crickett Carson testified: "On Christmas day I left home about 9 or 10 o'clock and went to Will Kelley's, my brother-in-law, staid there and eat dinner until 4 o'clock, and I went over with Montgomery Lewis to the wedding; staid down there until after dark, and came home.   Jim and my wife had been down to my brother Dick's and had come home when I got there.   I hadn't saw Sip. Ross for two or three days before that; didn't know whether he was at home or not.   Jim and I concluded to go over to Joe Campbell's to the dance; he hitched the mule to the buggy while I eat some supper.   He drove the buggy up to the house and I got in.   I took my winchester with me and set it down between my legs.   Jim drove, we started on.   I was hollowing and singing, 'Got

more money than a boat can carry.' When we got up opposite Sip. Ross' fence somebody shot from our left; the blaze of the gun went just in front of us; it scared me. The mule jumped forward, shied a little, and stopped. I turned around in the buggy to my left and looked back and said, 'Who are you shooting at?' Sip. Ross Said, 'Who called me an old black son of a bitch?' That was the first I knew who it was. I said to him, 'Nobody is calling you an old black son of a bitch. Why are you shooting at me?' Sip said, 'I am going to kill you anyhow,' and began to raise up his gun, and make as if he was going to shoot at me again. I said to him, 'Be easy! Be easy! Be easy!' saying it louder each time and then shot him. He jumped up off the ground and fell and hollowed 'Lizzie.' We then drove on. When we got down about three miles from there we met up with Mr. Arthur Baker and some others out by the side of the road. Mr. Baker hollowed at me and I stopped; we talked a little bit to one another and I told him I had had trouble that night; that I had killed Sip. Ross; that he waylaid me and shot at me and I shot him. We then went on to Joe Campbell's to the dance. I went in and asked Joe Campbell to pay me the $4.10 that he owed me. I told him that I had got into trouble and killed Sip. Ross. He said, 'How was it?' I told him that Sip. Ross waylaid and shot at me and missed me and I shot him. We staid there about one hour and left and went to Mr. Harmon Harral's and saw him, and went on to Honey Grove and saw Mr. Wells and Mr. Price, and then went on home. When we got to Sip. Ross' there was a crowd there, and Mr. Brashears, the constable, was there. We stopped, and Mr. Brashears came out 'to the buggy and we surrendered to him. He took us to Roxton, and then on to Paris and put us in jail. I did not make any threats against Sip. Ross to Mr. Ellington or Mr. Wooten. I did say, at the blacksmith shop, when Mr. Lynn was there, that if Sip. Ross did not quit talking about me and let me alone I would kill him."

Cross-examined: "I did not threaten Sip. Ross at any time to anybody except to Mr. Lynn, at Ben Franklin. I carried my gun just because I wanted to. I did have some money that belonged to Sip. Ross. That night, after I killed him, I went to Honey Grove and had a talk with Mr. Wells, my attorney. I went up singing, and after I killed Ross I left singing, 'I have killed old Sip. to-night and shot him with a winchester.'"

G. W. *Wells* and T. W. *Carlock,* for appellant; *Stillwell H. Russell,* also for appellant.

*Rob't A. John,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at fourteen years confinement in the penitentiary; hence this appeal.

The court gave a charge on manslaughter, to which the appellant ob-

jected on the ground that it did not state the facts or acts of deceased upon which said charge was predicated, and refers us to Warthan v. State, 41 Texas Criminal Reports, 385. That was a case where the adequate cause was a blow struck appellant by deceased causing him pain or bloodshed,—one of the adequate causes laid down by the statute. It was held in that case that the court should have directly instructed the jury if they believed that a blow was inflicted by deceased on appellant, and it caused pain or bloodshed, that same was adequate cause, and if they further believed it engendered passion which rendered defendant incapable of cool reflection, they should find him guilty only of manslaughter. In this case we are not advised of any specific act, much less a statutory act, which authorized a charge on manslaughter. It is true the firing of a gun by one person at another might, under circumstances, require a charge both on justifiable homicide and manslaughter, but we do not believe the record here presents such a case. Still the court gave a charge on manslaughter, general in its terms, and which authorized the jury to find appellant guilty only of that offense if they believed that at the time there was any act or provocation which, in the light of all the circumstances that may have gone before, rendered defendant's mind incapable of cool reflection, and under such conditions he slew deceased. This, we think, was all that he could demand.

Appellant makes several assignments with reference to the charge of the court. We have examined the same, but, in our opinion, there was no error in the charge. It is a clear and lucid explanation of all the salient features of the case.

Appellant further urgently insists that the facts proven do not sustain the conviction, and that the judgment should be reversed on this account. We have examined the record carefully, and in our opinion his contention is correct. Aside from threats proven against appellant prior to the homicide, and expressions made after the killing of a heartless character, there is no inculpatory evidence against appellant showing that he committed a felonious homicide, but all the evidence indicates that he acted in self-defense. He and his brother both testify (and they are the only eyewitnesses to the homicide) to a clear case which authorized him to slay deceased; and these facts, thus sworn to, are not gainsaid by anything in the record, but the extraneous circumstances proven by other witnesses all tend to corroborate them; so that, notwithstanding the respect we have for verdicts of juries, still in this case we do not believe that the facts showing how the homicide was committed authorized them to find defendant guilty of any offense. The judgment is accordingly reversed, and the cause remanded

*Reversed and remanded.*