WILBUR FLEWELLEN v. THE STATE.

No. 4455.   Decided October 17, 1917.

Rehearing denied June 19, 1918.

1.—Murder—Evidence—Conversation—Telephone—Res Gestae.

Upon trial of murder there was no error in admitting in evidence a conversation over the telephone by defendant and his companion with two certain women who were with deceased at the time of the killing, and who were importuned to meet defendant and his companion near the place of the homicide, nor the conversation of one of these women with defendant's companion immediately after the homicide.

**2.—Same—Evidence—Fabricating Testimony.**

Upon trial for murder there was no error in admitting in evidence defendant's declarations and acts with one of the women who was at the homicide, after the same occurred, and which tended to show that the defendant was trying to induce said women to fabricate testimony.

**3.—Same—Evidence—Size and Age of Deceased.**

Upon trial for murder, where the defendant introduced testimony that deceased was a very heavy kind of man, there was no error on cross-examination to show that deceased was about nineteen or twenty-one years of age, and that defendant was a man of about thirty-eight years of age. Following Treadway v. State, 65 Texas Crim. Rep., 208.

**4.—Same—Evidence—General Reputation—Bill of Exceptions.**

Where the bill of exceptions in no way showed what occurred with reference to interrogating the witnesses as to defendant's general reputation, there was no material nor reversible error. Following Huggins v. State, 60 Texas Crim. Rep., 214, and other cases.

**5.—Same—Evidence—Self-serving Declaration.**

Upon trial of murder there was no error in excluding a self-serving declaration of defendant, to the effect that the deceased fired at him before the defendant shot at deceased, which declaration occurred long after the homicide.

**6.—Same—Evidence—Presumption.**

Upon trial of murder there was no error in excluding testimony with reference to defendant's conduct some five months before the homicide, in taking no offense at what was said about the woman with whom he was infatuated and who afterwards was the cause of the difficulty. Following Maddox v. State, 76 Texas Crim. Rep., 217.

**7.—Same—Evidence—Impeaching Witness—Rule Stated.**

The rule is uniform in this State that it is not permissible to impeach any witness for truth and veracity by showing that his or her reputation for chastity is not good. Following Stayton v. State, 32 Texas Crim. Rep., 33, and other cases.

**8.—Same—Self-defense—Charge of Court.**

Where, upon trial of murder, the defendant claimed self-defense and the court in a separate and complete charge submitted the law on self-defense in accordance therewith, there was no reversible error.

**9.—Same—Provoking Difficulty—Charge of Court.**

Where, upon trial of murder, the evidence raised the issue of provoking the difficulty on the part of the defendant, there was no error in submitting a charge thereon and, also, on the converse of the proposition. Following Giesecke v. State, 64 Texas Crim. Rep., 531. See opinion for facts raising the issue of provoking the difficulty, in which the issue narrows down to a very close question. Morrow, Judge, dissenting.

**10.—Same—Provoking Difficulty—Rule Stated.**

If a person by his own wrongful acts brings about the necessity of taking the life of another to prevent being himself killed, he can not say such killing was in his necessary self-defense, and malice, express or implied, will be imputed. Following Thumm v. State, 24 Texas Crim. App., 667, and other cases.

**11.—Same—Malice—Charge of Court.**

Where, upon trial of murder, the court submitted a proper charge defining malice and malice aforethought, there was no reversible error. Following Witty v. State, 75 Texas Crim. Rep., 474, and other cases.

**12.—Same—Charge of Court—Provoking Difficulty—Rule Stated.**

Wherever an issue of fact is presented in the case, whether for or against either party, during the trial, it is the duty of the court to submit the law to that issue, and there being evidence in the instant case raising the issue of provoking the difficulty on the part of the defendant, it was the duty of the court to submit that issue to the jury; the issue of self-defense being in the case. Following Sorrel v. State, 74 Texas Crim. Rep., 505, and other cases. Morrow, Judge, dissenting.

Appeal from the Criminal District Court of Williamson. Tried below before the Hon. George Calhoun.

Appeal from a conviction of murder; penalty, imprisonment in the penitentiary for life.

The opinion states the case.

*Wilcox, Graves & Metcalf, A. S. Fisher, N. P. Woodward,* and *W. W. Hair,* for appellant.—On the question of provoking the difficulty: Wilson v. State, 81 S. W. Rep., 34; Smith v. State, 87 id., 151; Roberts v. State, 88 id., 221; Burney v. State, 51 Texas Crim. Rep., 20, 100 S. W. Rep., 381; Lockhart v. State, 53 Texas Crim. Rep., 589, 111 S. W. Rep., 1024; Kilpatrick v. State, 189 S. W. Rep., 267.

*E. B. Hendricks,* Assistant Attorney General, and *Sam D. Snodgrass,* for the State.

PRENDERGAST, JUDGE.—About 10 o'clock in the night of May 19, 1916, appellant ran down and shot and killed Roy McKinley on the streets of Temple. The State contended, and the proof was amply sufficient to show, that Leon Wilson was a principal with appellant in the killing. Appellant was convicted of murder with his punishment assessed at life imprisonment.

One trial was had in Bell County, which resulted in a mistrial—a hung jury. Later the district judge on his own motion, for ample grounds stated in his order, properly changed the venue to the Criminal District Court of Williamson County, where the trial occurred. The change of venue was clearly authorized under the statute (C. C. P., art. 626), and decisions thereunder. The trial court committed no error on this point as contended by appellant.

Appellant claimed to have been sexually intimate with a married woman, Mrs. Ileen Fehrenkamp from time to time, or most of the time, for three years prior to the time he killed deceased. The day before he killed him he went to Waco to see said Wilson. He tried to get said woman to go with him. She refused. At the time she, with her sister, then Susie Haney, later Murrell, together lived with their parents in Temple. While he and Wilson were together in Waco they wanted said two women to come to Waco and meet them. In effect they agreed to phone them for that purpose. Wilson put in the call and Susie answered. Wilson told her he wanted to talk to Ileen. Ileen refused to talk. Thereupon he talked to Susie and told her that he and ap-

pellant wanted them to come to Waco for said purpose. They refused. Appellant was present with Wilson when he did this talking, and when he failed to induce the women to meet them he called appellant to the phone, who continued the conversation with Susie in substance urging the two women to come to them at Waco as Wilson had done. They refused his solicitation. Appellant objected to said witness, Susie Murrell, testifying to the phone conversation she had with Wilson on this occasion. Her testimony was admissible. Practically, and under the circumstances in this case, it was the same as if appellant had carried on all the phone conversation with Susie himself.

On said night said two women, Ileen with deceased, and Susie with Roy Murrell, whom she married three days later, in one company, attended a skating rink in Temple. The two couples so returning had gotten within about a block of the home of the women. Appellant and Wilson, each armed with a pistol, that night went from Waco to Temple in a jitney and found these women with their escorts said distance from their home. The women, with their escorts, were walking on the sidewalk going home. As soon as appellant saw them he hurriedly got out of the automobile. As soon as they recognized him the women and their escorts ran from him. Appellant and Wilson followed them with their pistols. Appellant, while chasing them said to deceased, "Run, you son-of-a-bitch." Another witness said he said, "Run, you sons of bitches." Appellant and Wilson both shot at deceased, Wilson at least twice and appellant at least five times, killing deceased. Appellant continued after Ileen, and caught her; and Wilson continued after Susie and caught her. Over appellant's objection the court permitted Susie, in telling what occurred immediately after the killing, to tell what was said by Wilson to her and she to him at the time. All this testimony by her was clearly res gestae of the killing and admissible, as was held by the trial judge.

The court committed no error in permitting Mrs. Fehrenkamp to testify that while forcibly taking her to Belton with him that night that several times during the night appellant said to her that Roy McKinley, or that he, without calling deceased's name, shot first; that because she was scared and afraid not to say so to him that she answered his statement, "Yes"; but that, as a matter of fact, deceased did not shoot first; that appellant shot first. She swore deceased did not shoot at all. Any admission by appellant, as well as any testimony tending to show that he was trying to "fix" said witness to testify what was not true in his behalf was admissible.

Some witness in describing deceased and telling who he was, spoke of him as a boy, to which appellant made no objection. Appellant proved by Mr. Blum that deceased was "a very heavy kind of a man, about the same kind of man as Roy Murrell, probably heavier than Murrell and may be a little taller, too." (Murrell was a witness and testified before the jury.) There was no reversible error in the court's permitting said Blum to testify, and later proving by Mrs. Hawks that

deceased was nineteen to twenty-one years old. It was proved without objection that appellant was a man about thirty-eight years old. Treadway v. State, 65 Texas Crim. Rep., 222.

After the State closed its evidence the defendant, himself, testified. He next introduced W. S. Hunter of Belton, who testified that he was sixty years old; had lived in Belton for thirty years; been a druggist there for twenty years, and was formerly editor of the Belton Journal; that he had known appellant since he was a boy, and that appellant *lived in Belton most of that time;* that he knew his father for many years. He swore: "I am well acquainted with the defendant's reputation for truth and veracity *in Belton,* Texas, and it is good." On cross-examination the State asked this witness: "What about his, defendant's, reputation in Bell County as to whether he is a law-abiding citizen?" Appellant objected to this question and the court promptly sustained the objection. The question was not answered. Appellant had not up to this time placed his character in issue except for truth and veracity. Appellant then placed W. B. Smith on the stand, who testified that he was raised in Belton; was bookkeeper for an oil mill there and had been for years; that he had known defendant since he was a small boy. Appellant asked him, "Are you acquainted with defendant's general reputation for truth and veracity *in Bell County, among those people who knew him?*" He answered, "Yes." Q. "Is it good or bad?" A. "It is good." The State's attorney then asked him, "Now, Mr. Smith, as I understand you, you are confining your testimony on the question of reputation as it affects his reputation for truth and veracity?" Appellant objected to this question. The court overruled his objection. The witness did not answer that question, but the State then asked him this question: "Are you confining your answer as to defendant's general reputation for truth and veracity *in the community in which he lives?*" The witness answered, "Yes, sir." The appellant again objected to said question and answer and the court overruled his objection. The court qualified the bill by stating that no written charge was presented by counsel for defendant instructing the jury to disregard the questions or the effect of the same. The State did not offer any testimony or ask any other question seeking to show appellant's reputation as to whether or not he was a law-abiding citizen. As contended by the State, the State did not then know, and could not have known, that appellant was not going to put his reputation in this respect in evidence. Nor do the questions, or either of them, indicate that the defendant's reputation in this respect was bad, nor that the witness would not have answered that his reputation in this respect was good. The bill in no way shows that what occurred was material or reversible error against appellant. Huggins v. State, 60 Texas Crim. Rep., 214; Belcher v. State, 39 Texas Crim. Rep., 123; Phillips v. State, 59 Texas Crim. Rep., 534; Harding v. State, 49 Texas Crim. Rep., 601; Hart v. State, 57 Texas Crim. Rep., 24; Worthan v. State, 41 Texas Crim. Rep., 387; Baker v. State, 45 Texas Crim. Rep., 396; Renn v.

State, 64 Texas Crim. Rep., 639; Wyres v. State, 74 Texas Crim. Rep., 32, and other cases.

As stated, appellant killed deceased in Temple about 10 o'clock at night. He then captured said woman, Ileen Fehrenkamp, whom deceased was escorting at the time he was killed, and she swore against her will took her away from the scene to Belton, nine miles distant, walking a considerable part of the way trying to get a conveyance for himself and her from various persons on his route, and finally succeeding in getting a conveyance and reached Belton with her about 5 o'clock the next morning. The court did not err in excluding the testimony by the officer, offered by him, to the effect that when he then surrendered to the officer he said to him: "I have shot a man in Temple; the man fired at me one time before I shot at him." This statement by him could not have been any part of the res gestae, but was self-serving. 1 Branch's Ann. P. C., sec. 90, and authorities there cited.

The court did not err in excluding the proffered testimony of the witness Irvin to the effect that while he and others were with appellant in San Antonio some four or five months before appellant killed deceased that he told of an occurrence between said woman, Ileen Fehrenkamp, and one Bob Murrell, which indicated that said woman on that occasion had been intimate with said Murrell, and that appellant "said nothing and did not express himself as being displeased in any manner, but took the news and information apparently in a good humor and apparently was undisturbed by it." Such testimony was immaterial and irrelevant, too remote and, in effect, a presumption upon a presumption. Maddox v. State, 76 Texas Crim. Rep., 217, and authorities there cited.

The rule is uniform in this State that "it is not permissible to impeach any witness for truth and veracity by showing that his or her reputation for chastity is not good. Stayton v. State, 32 Texas Crim. Rep., 33; Woodward v. State, 58 S. W. Rep., 144; McCray v. State, 38 Texas Crim. Rep., 613; McAfee v. State, 17 Texas Crim. App., 139; Conway v. State, 33 Texas Crim, Rep., 327"; Hall v. State, 43 Texas Crim. Rep., 489. The court, therefore, did not err in excluding the testimony of other witnesses offered by appellant, to the effect that the State's witness Susie Murrell's general reputation for purity and chastity was bad.

Evidence that a witness has actually committed a given crime is not admissible for the purpose of impeaching the witness. The court did not err in excluding the testimony of said witness, Susie Murrell, offered by defendant to the effect that some eighteen months before the offense herein was committed she kept company with a married man by the name of Ducky Wilson, and that he kept her during that year; nor that Leon Wilson kept her during the time she went with him. 1 Branch's Ann. P. C., sec. 168, and authorities there cited.

The court gave a charge correctly and sufficiently presenting the issues raised by the evidence. Appellant made several objections to it and

requested several special charges, which were refused. The charge on self-defense was:

"11. A reasonable expectation of death or serious bodily harm will excuse a person in using all force, as reasonably appears to him to be necessary, to protect his life or person, and it is not necessary that there should be actual danger, provided he acted upon the reasonable apparent apprehension of danger, as it appears to him from his standpoint at the time, and in such case, the party acting under such real or apparent danger is in no way bound to retreat in order to avoid the necessity of killing his assailant.

"If the jury believe from the evidence in this case that the defendant, Wilbur Flewellen, on the night of the killing, got out of the jitney in which he was riding and called the witness Mrs. Ileen Fehrenkamp for the purpose of talking with said witness and for the purpose of effecting a reconciliation between them, and the jury further believe from the evidence in this case, viewing it from the standpoint of the defendant at the time, that immediately before the shooting of the said Roy Mc-Kinley by the said defendant that the said Roy McKinley made a demonstration as if to draw a weapon or did draw said weapon and fire at the said defendant, Wilbur Flewellen, and from the manner and character of said acts, if any, on the part of the said Roy McKinley, the defendant was caused to have a reasonable expectation or fear of death or serious bodily injury, and that the defendant acting under such reasonable expectation or fear, and while such reasonable expectation or fear continued, shot and killed the said Roy McKinley, deceased, or if you have a reasonable doubt as to such facts, then you will acquit the defendant and say by your verdict not guilty."

This charge was a separate paragraph and complete within itself. It amply submitted his claimed self-defense in accordance with his contention and as raised by him.

In another paragraph following this the court charged on provoking the difficulty and told the jury, in substance, that if they believed from the testimony beyond a reasonable doubt that appellant alone, or acting with Wilson, intentionally sought the meeting with deceased for the purpose of slaying him, and having found him did some act, or used some language, or did one or both, with the deliberate intention of producing an occasion and to bring on a killing of deceased, and that under all the circumstances what he did or said, or both, was under the circumstances reasonably calculated to provoke a difficulty, and because thereof deceased attacked him, or them, and he or they killed deceased in pursuance of his or their original design, if any, then the appellant could not justify himself on the ground of self-defense, but such killing under such circumstances would be murder. He then submitted the converse of this and told the jury, in substance, that if they failed to find such state of fact beyond a reasonable doubt then the jury are instructed that his right of self-defense would not be forfeited and he could defend himself; or use such means of defense as the facts and

circumstances indicated to him, viewing it from his standpoint, to be necessary to protect himself from danger, or what reasonably appeared to him at the time to be danger of his life or of serious bodily injury, and in passing upon that issue to give him the benefit of any reasonable doubt. This charge on provoking the difficulty and the converse thereof was a correct charge on the subject and strictly in accordance with the authorities. (Giesecke v. State, 64 Texas Crim. Rep., 531; 2 Branch's Ann. P. C., sec. 1953, where many cases are collated on the subject.) But appellant contends the evidence did not raise an issue of provoking the difficulty.

Among other contentions, appellant specially contends the court should have charged on his claimed self-defense that he "had the right to advance on deceased if it reasonably appeared to him at the time, judged from his own standpoint, that it was necessary for his self-protection to advance." This as applicable after he began shooting at deceased. He cites and relies upon Wilson v. State, 46 Texas Crim. Rep., 527, and Stanley v. State, 44 S. W. Rep., 519. In this Wilson case this court said: "The court also charged with reference to abandonment of the difficulty by deceased. The facts did not call for this charge. The witnesses graphically describe this fight as being 'fast and furious after it began' until it was finished. It was a continuous fight from its inception to its close. Some of the witnesses testified that Harrell, deceased, was retreating part of the time but he was fighting all the while; in fact, it seems that in moving around, the parties finally returned to the point where the difficulty began, and at this point deceased fell." Under those circumstances it was held the court should have charged the jury that Wilson "had the right to pursue or follow up this difficulty until all danger to himself had passed." But no such state of facts arose in this case. In said Stanley case it appears deceased had attacked Stanley, and after ceasing his attack then "was seeking to get behind the wall, or get in the dark, and renew the attack." Under those circumstances this court held it was proper for the court to charge, as it did, that Stanley had the right to pursue him if it appeared to him to be necessary for his self-protection. No such state of fact was suggested in this case. Hence, no such charge was called for herein.

The evidence on some of the issues was conflicting and contradictory. Notwithstanding this, when the evidence was sufficient to raise an issue in the State's behalf it had a right, and it was the duty of the court, to submit that issue on the theory of the State's contention, and even though appellant's evidence might have been sufficient to justify the jury to find in appellant's favor on such issue. In stating and discussing the evidence on these issues it is not the purpose to give all the evidence in detail tending to prove or disprove such issue, but only to give, in substance, what the jury, from all the evidence, were authorized to find and believe, and base their verdict upon. Appellant was thirty-eight years old, an unmarried man. From time to time, for a period

extending over about three years before he killed deceased, he claimed he had been criminally intimate with Mrs. Fehrenkamp, a married woman, having her to meet him, with intervals intervening, more or less frequently, for their sexual indulgence. During this period of the liaison he said they had a number of disagreements or estrangements, but that after a time they generally made up and renewed their illicit relations. Latterly, before he killed deceased, he evidently became more infatuated with her and jealous. He demanded she should indulge him alone and extend her sexual favors to no other man, and objected to her going with any other man. About ten days before he killed deceased he had an engagement with her to meet him at Belton, at a certain hour. Instead of meeting him at the time agreed she went grape hunting in the country with deceased, riding on his motorcycle with him. When she did meet appellant an hour or two after the time agreed, he demanded to know why she had not met him at the time agreed. Along about this time, and shortly before, deceased had been going with, and going to see, Mrs. Fehrenkamp. They both lived in Temple, and appellant knew this. She did not want him to know she had been grape hunting in the country with deceased on said occasion, and when he demanded to know why she had delayed her meeting with him she told him first one thing, then another, stating them, had delayed her. Each time when she would tell him these causes of delay he would tell her that that was a lie, and finally he told her she had to tell him the truth. Thereupon she told him she had been with deceased in the country on a grape hunt. He immediately, and because she had been with deceased, as she swore, struck her a violent blow in the face, bruising and blacking her face and eye, which showed for several days afterward, and caused her considerable pain and injury. She then at once ceased all relations with appellant and refused to see him, to talk with him or otherwise communicate with him thereafter, except she, it seems, talked over the phone with him when he tried to get her to go to Waco with him, and also while in company with Mrs. Guinn one time. From that time on until he killed deceased he persistently tried to get her to make up with him. He wrote to her, phoned her, and had Mrs. Guinn, their mutual friend, to see her for him, offering to pay her (Mrs. Guinn) $10 to even get Mrs. Fehrenkamp to see him and offering Mrs. Fehrenkamp to buy for her and her child all clothes they would need for months. As stated above, he tried to get her to go with him to Waco the day before he killed deceased, and while in Waco he had Wilson, and he himself, tried to get her to come to him in Waco. She positively and persistently refused all his overtures and refused to even talk to him over the phone while he was at Waco when he and Wilson both tried to get her to do so, the same day, before he killed him that night. In this phone talk by appellant with Susie Murrell when he was urging her to bring Mrs. Fehrenkamp to him at Waco, Mrs. Murrell swore he said: "You had better come and bring her with you because that other party might not be there to take her any more"—he said, "that other

party might not be there to take her any more." This reference by him to "that other party" could have meant no other than deceased, for the deceased was the only one who was then, and shortly before that had been, taking Mrs. Fehrenkamp anywhere and was the only other man who was shown to have been with her recently. So far as appellant was concerned, Mrs. Fehrenkamp had the right to see and to go with deceased at any time and place she desired, and deceased also, so far as appellant was concerned, had the right to see her and go with her whenever and wherever he pleased. Appellant knew that deceased, and only he, was the direct cause of said woman breaking off her relations with him. Just a short time before he killed deceased, appellant had beat her up because she had been with deceased, as shown. From the State's standpoint and evidence, the jury were authorized to find and believe that appellant was not hunting said woman the night he killed deceased, for the purpose and with the hope of getting her to make up with him, but that at the time, he sought deceased, "that other party," doubtless expecting to find him, as he did, with that woman and to wreak his vengeance upon him because he had taken her away from him, or was the cause of her breaking with him and her refusal to make up with him, and kill him if he got the opportunity.

The evidence further shows that when he and Wilson reached Temple from Waco on their way to Belton, where they had hired the jitney man to take them, he had the driver to drive around in Temple on various streets not on their route to Belton, and he had him to drive slow past the home of said woman, and when they reached that point he ordered the driver to stop, and as he began to do so appellant said, "Well, we don't want to stop here, we will alarm everybody around here; drive up." They then continued to drive slowly up the street on which said woman's home was until he met the women with their escorts about a block from their home. Appellant was on the watch while thus riding along and must have expected to meet these persons, for immediately upon doing so he ordered the driver to stop, but before he could do so he hurriedly got out of the automobile—Wilson did too—and took after them. They discovered him by the time he discovered them and they immediately began to run from him to save their persons and their lives. They so continued their flight with appellant and Wilson in hot pursuit until they ran him some 200 yards and shot him down. Soon after this chase began, according to several eyewitnesses for the State, appellant and Wilson both began shooting at deceased, and continued shooting until they shot him down like a dog and killed him, without deceased saying a word or doing anything whatever to either of them. Appellant swore, however, that he did not shoot at deceased until deceased pulled a pistol and shot at him. The State's eyewitnesses swore that deceased did not shoot at him at any time and that he did not draw any pistol at all. Whether he did or not, the court, in the charge quoted, submitted his claim of self-defense in accordance with his con-

tention and as raised by him, even if his self-defense was raised at all.

It is hard to conceive of a more aggravated case of provoking a difficulty than the evidence in this case shows occurred. Here deceased was quietly walking along on the sidewalk of a street of Temple, taking Mrs. Fehrenkamp to her home. Her sister, Mrs. Murrell, and her husband were along in the same company. Deceased had the right to be where he was and do what he was doing. He said and did nothing whatever to appellant. Appellant had no right whatever to take after deceased and Mrs. Fehrenkamp and run them down, whether for the purpose of talking to her or not; or for the purpose of capturing said woman and forcibly taking her away from deceased, as she swore he did, just after he had—and it was a part of the same transaction—killed deceased. He chased deceased and said woman for about 200 yards before he killed him but began shooting at him some considerable distance before he finally succeeded in killing him, his bullets striking deceased three times before he succeeded in shooting him down. There can be no particle of doubt that from the unquestioned facts of this case the deceased had the right to draw a pistol and shoot at appellant and Wilson, or either, and if he had done so it would unquestionably have been in his self-defense. Deceased was the person on this occasion who had a right to defend himself by shooting at and killing appellant or Wilson, or both of them. So that whether the issue of provoking the difficulty was in this case or not, surely a perfect right of self-defense did not arise in appellant's favor.

The law is as stated in Vernon's Crim. Stats., page 653: "If a person by his own wrongful act brings about the necessity of taking the life of another to prevent being himself killed, he can not say that such killing was in his necessary self-defense; but the killing will be imputed to malice, express or implied, by reason of the wrongful act which brought it about, or malice from which it was done. A person can not avail himself of a necessity which he has knowingly and wilfully brought upon himself." A large number of decisions of this court directly in point so establishing the law is cited. See also 2 Branch's Ann. P. C., section 1953, where he lays down the same doctrine and cites many cases. See also Thurman v. State, 24 Texas Crim. App. 700; Davis v. State, 81 Texas Crim. Rep., 450, 196 S. W. Rep., 522.

Under the law, and the facts and circumstances of this case, the court did not commit reversible error in submitting the question of provoking the difficulty and the converse thereof in the terms he did.

The judgment will be affirmed.

*Affirmed.*

ON REHEARING.

January 18, 1918.

PRENDERGAST, JUDGE.—Appellant again presents some of the questions which were decided against him in the original opinion, and

he complains that the court did not pass upon one question which he presented, which was his complaint of the charge of the court in defining malice and malice aforethought.

The court's charge on this subject was this: "Malice aforethought is the voluntary and intentional doing of an unlawful act, by one of sound memory and discretion with the purpose, means and ability to accomplish the reasonable and probable consequences of the act.

"Malice aforethought includes all those states of mind under which the killing of a person takes place without any cause which will in law justify, excuse or extenuate the homicide. It is a condition of the mind which shows a heart regardless of social duty and fatally bent on mischief, the existence of which is inferred from acts committed or words spoken.

"Malice in its legal sense denotes a wrongful act done intentionally without just cause or excuse." His complaint was directed to the last paragraph just quoted defining malice in that the word "just" was used instead of the word "legal" before the words cause or excuse. This criticism is hypercritical. But the holding of this court has been directly against his contention. The court's definition of both "malice aforethought" and "malice" herein is a literal copy from the court's charge in Witty v. State, 75 Texas Crim. Rep., 444, which was expressly approved as correct by this court. For other cases see note 4, 1 Vernon's Crim. Stats., p. 689, and cases there cited.

Judge White, in his Ann. P. C., says: "Although, in its popular sense, 'malice' means hatred, ill will or hostility to another, the legal significance of 'malice aforethought' is more extensive, and includes all those states of the mind under which the killing of a person takes place without any cause which will in law justify, excuse, or extenuate the homicide. It is 'the doing of a wrongful act intentionally, without just cause or excuse.' 'It is a condition of the mind which shows a heart regardless of social duty and fatally bent on mischief; the existence of which is inferred from acts committed or words spoken.' Lander v. State, 12 Texas, 462; McCoy v. State, 25 Texas, 33; Tooney v. State, 5 Texas Crim. App., 163; Evans v. State, 6 Texas Crim. App., 513; Harris v. State, 8 Texas Crim. App., 90; McKinney v. State, 8 Texas Crim. App., 626; Kemp v. State, 13 Texas Crim. App., 561; Hayes v. State, 14 Texas Crim. App., 330; Cahn v. State, 27 Texas Crim App., 709; Gallagher v. State, 28 Texas Crim. App., 247; Powell v. State, 28 Texas Crim. App., 393; Vela v. State, 33 Texas Crim. Rep., 322. Either of the definitions of 'malice' above given will be sufficient in a charge, and so would any other definition of the term embracing substantially the same meaning. Martinez v. State, 30 Texas Crim. App., 129."

Appellant also again complains that this and the lower court were wrong in holding that the evidence raised the issue of provoking a difficulty with deceased by appellant. The testimony raising that issue was succinctly stated in the original opinion. There are two matters

in connection therewith which will be here stated. He claims that the
evidence shows his meeting with deceased the night he killed him was
a mere casual and accidental meeting, that he did not *know* that it was
deceased at the time he killed him; and that the court in the original
opinion, wherein it was stated that deceased and Mrs. Fehrenkamp
after they began to run from him continued their flight with he and
Wilson in hot pursuit until they had run him "some 200 yards" and
shot him down; the complaint being that the evidence showed the dis-
tance they chased him was not "some 200 yards" but a very much
shorter distance. All the testimony shows that appellant and Wilson
followed and chased deceased from the point where they got out of the
jitney to where the body of deceased fell. Mr. Herndon, one of appel-
lant's witnesses, swore that this distance was "something like 150 or
200 yards." Appellant himself swore that this distance was "about
anywhere between 125 and 200 yards—maybe more, maybe not so much."
No other witness undertook to give this distance. However, it may be
that the distance was not as much as 200 yards.

Appellant himself swore that he knew deceased "when I saw him."
That he knew Bob McKinley, a brother of Roy McKinley, and had
known him a good while; that shortly before the killing he saw deceased
at Belton and asked him, "Aren't you Roy McKinley?" He replied he
was; and he said he thought so because he looked so much like his
brother Bob. It was also shown that deceased had lived in Temple
for a number of years; that appellant himself had lived there one year,
and that latterly he lived at Belton, only a few miles from Temple, the
two places being easy and near of access, connected by an interurban
car line. That his said woman, Mrs. Fehrenkamp, lived at Temple,
with whom he frequently had access there. It was shown also that ap-
pellant knew deceased was then calling on and going with Mrs. Fehren-
kamp and that no other person was at that time. Just a few days
before this he had beat her up because she did go with deceased. Ap-
pellant swore he was hunting for Mrs. Fehrenkamp that night, and, of
course must have suspected if he did not know that if he found her out
from her home like he did find her that she would be with deceased
and not another. He had just driven around her home and he and the
other witnesses who testified on the subject said that he had the jitney
man drive him down the street she lived on to almost the corner of the
block beyond where she lived. He says he saw her and her sister Susie,
and their respective escorts, deceased and Roy Murrell, as they turned
the corner into Fourth Street at the cold storage house. The testimony
clearly shows that there was an electric light in the center of the street
right at this corner, and in addition, there was an electric light at the
corner of said cold storage house itself, which must have made it very
light. He immediately recognized them, and they immediately recog-
nized him. They ran from him for their lives. He, with undue haste,
got out of the jitney and took after them, and just after beginning the
chase, Murrell swears appellant or Wilson said to them, "Run, you

sons of bitches." Susie Murrell swore that while chasing them, just as he passed her, appellant said to deceased, "Run, you son-of-a-bitch."

From all this and other items of testimony the jury unquestionably were authorized to believe that appellant knew that it was deceased who was with Mrs. Fehrenkamp as soon as they turned the corner at the cold storage house, and took after him with his sixshooter and called to him and Mrs. Fehrenkamp both, "Run, you sons of bitches," and later to deceased himself, "Run, you son-of-a-bitch," and still chased them with the intention of forcibly taking Mrs. Fehrenkamp away from him, all for the purpose and with the intent to goad him so as to provoke him and induce him to draw his pistol, and even shoot at him, as appellant says he did, so that he could have an excuse to kill him under the pretended claim of self-defense. Even if appellant's meeting with deceased when he turned the corner at the cold storage house was casual or accidental, yet all that he did and said thereafter was wilful and intentional, and not only reasonably calculated to provoke him to attack appellant to save himself and Mrs. Fehrenkamp, but actually did so provoke him to attack appellant, if he did as claimed by appellant. The evidence clearly justified the jury to so find and believe and the question was so raised as to authorize and require the court to submit the question of provoking the difficulty as he did.

We see no necessity of discussing again any of the questions decided in the original opinion. They were all correctly decided.

The motion is overruled.

*Overruled.*

MORROW, JUDGE.—The evidence does not make a case involving the law of provoking the difficulty.

MORROW, JUDGE (dissenting).—I am unable to conclude that the facts of this case authorized a submission of the law of provoking the difficulty in connection with that of self-defense; nor am I satisfied that the issue of perfect self-defense was raised. The State's evidence points to a homicide without justification or excuse. From its viewpoint there was no difficulty between the deceased and the appellant, but the appellant pursued and shot deceased while the latter was engaged in no act except an effort to escape. From the appellant's evidence the inference to be drawn is that his pursuit of the deceased was incidental to his efforts and desire to talk with the woman who was the companion of the deceased. Appellant's conduct and manner in undertaking to obtain this interview was wrongful and doubtless reasonably calculated to cause the deceased to attack him, or at least to make a demonstration to resist appellant's advances. In fact of such a character was his conduct that I am of opinion that if it be true, as he claims, that the deceased did attack him or make a demonstration to do so, that appellant was not possessed of the right of self-defense, but that his right to defend was modified by his previous wrongful conduct to a degree that,

viewed in its most favorable light, the homicide would be manslaughter See Reed v. State, 11 Texas Crim. App., 509, and other cases cited in Branch's Crim. Law, sec. 463. Though in the wrong it does not follow that appellant would forfeit all right to defend his life should his conduct bring about an assault upon deceased, unless the appellant, having formed the intent to kill or seriously injure deceased, provoked the attack that he might have occasion to effect this purpose. See Jones v. State, 17 Texas Crim. App., 611; Thumm v. State, 24 Texas Crim. App., 667; Branch's Crim. Law, sec. 464, and cases cited. In other words, the intent to kill or seriously harm his adversary must be antecedent to the provocation in order to deprive one of all right to defend against an assault provoked by him, and then only is such right lost when the assault is provoked with intent to carry into effect the unlawful purpose. In this instance I am impressed with the view that appellant did not know the identity of Mrs. Fehrenkamp's companion; that his conduct leading up to the homicide was not induced by a desire and intent to kill deceased, but by an intent, in all events, to obtain possession of the woman who was the companion of deceased at the time. I, therefore, think that the trial of the case upon the theory that appellant provoked the combat or produced the occasion in order to have a pretext for killing deceased or doing him great bodily harm, was one not arising from the evidence, and, therefore, erroneous. I recognize, however, that there is often great difficulty in determining just when a combination of facts justify a charge on the law of provoking a difficulty, and I know that my associates have given to this record the most painstaking investigation and careful thought. They may be right. Unable to reach that conclusion, however, I take this occasion to briefly express my reasons.

DAVIDSON, Presiding Judge (concurring).—On motion for rehearing the case narrowed itself down to one proposition, that provoking a difficulty is not in the case, and, therefore, the trial court erred in putting such limitation upon his theory of self-defense. It is a very close question as to whether self-defense was an issue in the case, but the court resolved this in favor of defendant and gave an instruction on that subject. Appellant contends that provoking the difficulty not being in the case, the judgment should be reversed because of this unwarranted limitation on his right of self-defense. It may sometimes occur that there is rather a narrow margin between provoking a difficulty and imperfect self-defense. It is not my purpose to go into that question. There may be cases of imperfect self-defense arising independent and apart from provoking the difficulty, but in the mind of the writer that question does not here arise. The question of provoking a difficulty, however, in the mind of the writer, is presented by this record.

Judge Prendergast has pretty fully stated the facts and it is deemed unnecessary to restate the evidence. That appellant had been having

illicit relations with the woman with whom deceased was in company on the night of the tragedy seems to be conceded. That he knew the deceased had supplanted him, or was about to do so, or was enjoying her favors and friendship, is, I think, shown by this record by the statements of appellant and the testimony of the witnesses. He had had trouble with the woman shortly before this killing for being out with deceased. This is shown by the woman's testimony, and during this trouble between them he struck her a blow in the face. This caused her to refuse to have further relations with him. He and his friend, Wilson, undertook to cause a meeting between themselves and this woman and her sister, which had been declined. They came from Waco through Temple to see these women and were unable to find them. Finding them away from home, these parties went in a jitney about the town seeking them. Finally they discovered the two women and their companions walking along the street or sidewalk. Appellant immediately jumped out of the car with a pistol in his hand and pursued the women and deceased. They ran something like 200 yards, appellant and his friend pursuing them. Appellant, it seems, could not overtake or had not overtaken the deceased and the women, and holloed at deceased, "Run, you son-of-a-bitch." Thereupon it is claimed deceased turned and fired. There is testimony that he did not fire.

Wherever an issue is presented in a case, whether for or against either party during the trial, it is the duty of the court to submit the law applicable to that issue. If there was evidence in the case raising the issue of provoking a difficulty, then it was the duty of the court to submit that issue to the jury. Of course, without the issue of self-defense in the case a charge on provoking a difficulty would not be justified. If appellant chased the deceased and killed him without holloing at him and applying the opprobrious epithet mentioned, or shot him while he was running, and deceased had done nothing, the issue of self-defense would not be in the case. If in chasing the women and deceased, deceased was about to get away, and appellant holloed at him, as it was said he did, the applying of that opprobrious epithet is sufficient to raise the issue of provoking a difficulty under the authorities. After using that epithet and deceased fired, then if appellant had a right of self-defense, this was a proper charge of limitation on his right of self-defense. In Mr. Branch's Ann. P. C., on page 1094, section 1954, will be found a collation of the authorities on the question of provoking a difficulty. It is stated that while the party must have said or done something at the time of the homicide to provoke deceased to attack him so as to have a pretext for killing the deceased, yet prior acts will be looked to to give character to what defendant said or did at the time of the homicide so as to determine his intent and to explain his words and acts. McGrew v. State, 49 S. W. Rep., 228; Mason v. State, 163 S. W. Rep., 66. Under this view of the law the acts and matters preceding, on the part of appellant, and his ill will and bad feelings towards deceased on account of the woman and their relations, would shed light

upon the issue of appellant's intent at the time and just preceding the killing and at time of calling him a son-of-a-bitch. It is also laid down by the authorities that if the testimony for the State shows that defendant sought deceased with intent to provoke a difficulty and offered him an insult before the shooting started, it is not error to charge on provoking the difficulty. Barstado v. State, 48 Texas Crim. Rep., 255; Gray v. State, 61 Texas Crim. Rep., 454; Sorrell v. State, 74 Texas Crim. Rep., 505. It is also held that it is not error to charge on provoking the difficulty if there is testimony to the effect that defendant first cursed deceased before either made an assault, and the State's theory is that defendant made the first assault and defendant's theory is self-defense. Coleman v. State, 25 S. W. Rep., 772; Bateson v. State, 46 Texas Crim. Rep., 46, 80 S. W. Rep., 88. And where there is testimony that defendant cursed deceased and deceased then picked up a stick and started toward the defendant, this raises the issue of provoking the difficulty, and it was not error on the part of the court to so instruct the jury. Tardy v. State, 47 Texas Crim. Rep., 444, 83 S. W. Rep., 1128; Best v. State, 61 Texas Crim. Rep., 554, 135 S. W. Rep., 582. Again it was said in Sanders v. State, 83 S. W. Rep., 712, that the issue of provoking the difficulty is raised by testimony when defendant called prosecutrix a bitch, and that prosecutrix then hit defendant with her fist, and that defendant then struck her with a hatchet.

The writer is of opinion that under all the facts and circumstances detailed prior to and up to the homicide introduced to show the condition of appellant's mind toward deceased with reference to the woman, and that when appellant found them he jumped out of the jitney and chased the deceased and the woman, and when they were about to escape his exclamation to deceased to "Run, you son-of-a-bitch," was intended to arrest the flight of deceased and cause him to fight. If deceased fired the first shot by reason of these acts and this conduct, it would raise the question of provoking the difficulty, and would be a limitation upon his right of self-defense. I, therefore, concur with Judge Prendergast in holding that the question of provoking the difficulty was properly submitted under the facts.