MOTERN MIDDLETON V. THE STATE.

No. 22670. Delivered January 5, 1944.
Rehearing Granted April 12, 1944.

GRAVES, Judge, dissenting on motion for rehearing.

The opinion states the case.

*Baker & Baker,* of Coleman, for appellant.

*Ernest S. Goens,* State's Attorney, of Austin, for the state,

GRAVES, Judge.

Appellant was convicted of murder without malice, and as-sessed a term of two years in the State prison.

There is but one bill of exceptions in the record and that re-lates to the claimed misconduct of the jury. It is rather volumi-nous, consisting of 73 pages in question and answer form, such

certified as necessary by the trial court. The statement of facts in the trial of the main case consists of but 43 pages, thus evidencing the fact that the trial of the jury's misconduct took up more of the court's time than the trial of appellant.

The facts are claimed to be insufficient to establish appellant's guilt, and it is alleged that same showed a killing in self-defense only.

Appellant and several other negroes had passed the home of the deceased's father, who was a Mexican. A dog, belonging to the father, had barked at appellant, who was very nervous, and some conversation ensued relative to the dog's conduct. Appellant and his companions then went on down to a pool or creek near the home of deceased's father and were preparing to go in swimming. The deceased, Nino Sandejos, accosted the negroes, and probably some rather strong language was used by both parties. The conversation being over, these negroes went in swimming at such place, which was near where the deceased and his father lived. Finally the deceased went to the nearby car of a friend and took a 22 rifle therefrom, and came up to where appellant was standing, and pointed the gun at appellant's stomach. A witness stated, and the jury evidently believed, that appellant at such time had a pistol in his hands hidden behind his body. Eventually appellant claimed to have grasped the gun and same went off, making a small wound upon his little finger; he then shot the deceased in the neck, and took the 22 rifle and threw it in the nearby creek. The deceased was wounded in a dangerous place near the jugular vein, and he was taken to a hospital where, after examination, the doctor refused to operate and extract the bullet, but directed that he be taken home and left to await developments. The wife of deceased was dissatisfied with such treatment and put him in an automobile and carried him to Brownwood, some miles distant from deceased's home. The doctors there proceeded to operate immediately, and the deceased died soon on the operating table.

The facts upon which the jury could predicate the verdict rendered are present in the record, and we do not think this court would be justified in setting this verdict aside on account of such insufficiency.

The allegations relative to alleged misconduct of the jury are to some extent supported by the affidavit of one of the jurors, but it is noticed that pertinent portions of such affidavit were not supported by the testimony of such jurors; in fact some of

the statements in the affidavit were denied by the juror as having been made by him. Some of the statements complained of as having been made in the jury room were but argumentative matters, and made well within the province of the jury, such as that if appellant was sent down to the penitentiary it might make a better man out of him. A portion of the object of punishment provided for by the statute is "to reform the offender." Art. 2, P. C.

Again it is complained that a certain juror was prejudiced against the law of suspended sentences, and that he had so expressed himself in the jury room, notwithstanding the fact that he had expressed himself as being of an opposite view on his voir dire examination. According to the testimony adduced on the motion for a new trial, we are inclined to the belief that what the juror said was that he was opposed to the granting of a suspended sentence to this appellant whom he thought had committed a murder; that he did not believe in granting a suspended sentence on account of the facts produced in this case; that the juror himself would rather run than shoot a man.

After a patient reading of this voluminous bill, as certified to by the trial court, we are of the opinion that there was no erroneous conduct upon the part of the jury to such an extent that would justify this court in reversing this case. Without a further attempt to here review other claimed acts of misconduct upon the part of the jury, suffice it to say that we are of the opinion that such alleged acts as would have constituted misconduct upon the part of the jury are not sustained by the evidence.

Finding no error in the record, the judgment is affirmed.

## ON MOTION FOR REHEARING.

HAWKINS, Presiding Judge.

In his motion for rehearing appellant contends that all the evidence both of the State and appellant shows that he acted in self-defense and therefore his conviction is not justified. The State's first witness, Robert Fulton, testified in substance that he, in company with appellant and others, went to a creek at a point about one hundred yards below the home of deceased's father to go "swimming;" on the way to the creek they passed the home of the deceased's father and a dog ran out and barked at them; appellant threw a rock at the dog and deceased's father asked him not to "chunk" the dog, whereupon appellant re-

marked, "Call your dog back." About the time they were ready to go into the water someone said, "Here comes that Mexican boy." Witness saw deceased with a rifle, the barrel of which he had pressed against appellant's abdomen. Witness heard a shot and saw appellant take the gun from deceased who was lying on the ground, and throw it into the creek. Appellant did not attempt to shoot deceased any more.

The State's second witness, Johnny Williams, testified in substance that he was present at the time and place of the shooting; he heard deceased "holler" while he was still at the house but did not understand what he said. Appellant replied, "You go to hell." Soon deceased came to the swimming hole and asked appellant if he was trying to get smart with him; appellant replied with some ugly words, at which time he had a pistol in his hand behind his body; deceased had a rifle in both hands pointing it towards appellant; he saw deceased put the end of the rifle into appellant's stomach; appellant knocked the gun up and it fired; then appellant shot deceased. After deceased fell he saw appellant pick up the rifle and throw it into the creek.

Mrs. Ada Thomas testified that she was at her father's home located on the south side of the creek. We quote from her testimony.

"The defendant and deceased were in sight of me when the shooting occurred. The deceased was standing between me and the defendant; they were facing each other. The deceased had his back towards me. I did not see the defendant before he shot the deceased. When the deceased fell the defendant grabbed the gun out of the deceased's hand, threw it in the creek and said, 'You ain't going to shoot me.' When the deceased was shot he had the gun lying on his arm. I don't know just how that gun was lying at the time the defendant shot. I didn't hear but one shot at the time of the killing but there could have been more than one. The way it was the defendant shot him and he fell and he ran, grabbed the gun out of his hand and threw it in the creek. Just before the defendant grabbed the gun out of deceased's hand he said, 'You are not going to shoot me with that gun'."

Appellant testified in his own behalf, in substance: That he and deceased had not had any trouble prior to the day of the shooting; that while he and his companions were at the swimming pool, getting ready to go in bathing, the deceased hollered at them saying: "You damned negroes get off of that bank," to

which he replied, "You go to hell." After the remarks were passed deceased came to where appellant was and said, "What damn smart words were those," He then threw a gun into appellant's stomach; appellant knocked it away and the gun fired, whereupon he shot deceased; that he did so because he thought his life was in danger when he had a gun pointed at his stomach; that he believed deceased was going to shoot him; that appellant would not have shot deceased if he had not believed that deceased was ready to shoot him (appellant.)

Article 1207 P. C. provides that homicide is justifiable in the cases enumerated in the succeeding articles. Article 1223 P. C., which is one of the articles referred to, reads as follows:

"When a homicide takes place to prevent murder * * *, if the weapon or means used by the party attempting to commit such murder * * * are such as would have been calculated to produce that result, it is to be presumed that the person so using them designed to inflict the injury."

See McCoy v. State, 135 Tex. Cr. R. 73.

Article 45, P. C. provides as follows: "The intention to commit an offense is presumed whenever the means used is such as would ordinarily result in the commission of the forbidden act."

In the instant case, all the evidence shows that deceased made an assault upon appellant with a deadly weapon. The presumption obtains that he intended to kill appellant or inflict serious bodily injury upon him. Appellant appears to have been justified in the conclusion that deceased intended to kill him or to inflict serious bodily injury. Under the circumstances he would be justified in the exercise of his legal right of self-defense to resort to such means and such force as seemed reasonably necessary to him to protect himself against such an unwarranted assault. See Smith v. State, 15 Tex. Cr. App. 338; Carson v. State, 43 Tex. Cr. R. 265 and Clarkston v. State, 79 S. W. 304; Pittman v. State, 140 Tex. Cr. R. 264, 144 S. W. (2d) 569.

It is not necessary to detail the evidence in the Smith case (supra), but in passing upon the question of the sufficiency of the evidence, Judge Hurt, writing for the court, said:

"Was the conduct of the deceased in this case of such character as was reasonably calculated to create in the mind of the defendant this apprehension of death or serious bodily harm?

Could any other inference be drawn from his conduct than that he intended to murder the defendant? Was not this the only reasonable conclusion which could be made from the facts? If so, is it not reasonable and just to presume that the defendant believed his life to be in danger, and shot his adversary to save his life? If there be any force in facts, if there be truth in witnesses, if there be reason in man, the defendant certainly believed his life to be in extreme danger. Not thus to believe under the circumstances of this homicide would argue him insane. Do not the facts in this case bring the defendant clearly and fully within the rule stated above? If not, is it possible for a party accused of murder to make the rule a protection, notwithstanding the verdict of the jury? Or is this rule completely within the control of the jury, to be extended to or withheld from the defendant at their pleasure, be the evidence what it may? We are of the opinion that the evidence in this case fails to show the defendant guilty of murder, but, to the contrary, if such be possible, makes a case of self-defense beyond any sort of question, and that the verdict of the jury is not supported by the evidence."

See also Carson v. State, 43 Tex. Cr. R. 265; Green v. State, 162 S. W. 1151.

Having reached the conclusion upon further examination of the facts that the evidence does not support appellant's conviction for the offense of murder, the motion for rehearing is granted, the order of affirmance is set aside and the judgment of the trial court is reversed and the cause remanded.

### ON MOTION FOR REHEARING.

GRAVES, Judge (dissenting on motion for rehearing).

My Brethren have seen fit to grant appellant's motion for a rehearing herein and to reverse this case upon the facts alone, holding in effect that the facts show a case of perfect self-defense. To this I do not agree, and will endeavor to give my reasons therefor.

The facts relied upon by the State show that appellant, a negro 19 years old, in company with other negro boys, on the day of the killing, about 2 o'clock P. M., passed by the home of the deceased's father, and appellant had some words with the deceased's father about a dog barking at him, and "chunked" the dog, stating that he was nervous. The negroes then went on

down to a hole of water where they were going to swim, at least one of the negroes had taken off his clothes and was in the water. The deceased was seen approaching the negroes, and, according to some of the witnesses, said, "What are you d-negroes going to do?" Appellant then replied, "You go to hell," and at that time he had a pistol concealed behind him; he also then addressed an insulting and obscene epithet to the deceased. The deceased had in his hand a 22 calibre rifle, and according to Mrs. Ada Thomas' testimony we quote:

"Q. Where was Nino (the deceased) holding the gun when he was shot?

"A. He just had it lying on his arm. * * *

"I don't know how he had that gun in his hand when he left the house but at the time he was shot the Mexican, Nino, just had the gun lying on his arm; he just had the gun barrel lying on his arm just before the shot was fired.

"When the gun was lying on Nino's arm, the negro was up on the bank; Nino never did have time to fire or nothing else when he was shot. I don't know just how that gun was lying at the time the negro shot.

"I didn't hear but one shot at the time of the killing, but there could have been more than one shot; if there was more than one shot, I didn't hear it. * * * I was just across the road from where they were; that is a dirt road but I don't know just how wide it is. * * *

"The way it was: the negro shot him and he fell and he ran and grabbed the gun out of his hand and throwed it in the creek. Just before the negro grabbed the gun out of the Mexican's hand, he said, 'You are not going to shoot me with that gun;' that is all I heard."

The wife of the deceased testified she heard the deceased tell the negroes not to pull off their clothes on top of the bank.

George Sanchez testified that he was the owner of the 22 rifle; that he arrived at the scene of the shooting, and was shown the rifle in the edge of the water; that he picked it up out of the edge of the water; that the gun had no shells in it; they had no shells for it, and none were in it.

Relative to appellant's claim that the deceased fired the rifle at him and shot him in the finger, Sheriff Robey testified: "I looked at both of his (appellant's) hands; that scar you show me wasn't there at that time; I didn't see any open wound on his hand at that time, but there was just a small scratch on his

finger at that time; like it had been scratched on a nail or something like that; it was just a scratch."

Robert Fulton, one of the negroes, testified that while putting on his clothes he heard shooting; "I heard the shooting but I did not see it; I did not hear but one shot; I just heard the gun go off and wasn't paying much attention as I was putting my clothes on. After I heard the shot I saw Motern Middleton going up the road toward town."

Johnny Williams, one of the negroes, testified:

"I heard the Mexican, Nino Sandejos, speak to Motern Middleton, the defendant after he got down to the creek; I heard him holler down there to Motern; I heard him holler while he was still up at his house; I don't know what he said when he hollered, as I was still in the water; when he hollered at Motern, Motern told him to go to hell; when Nino came down there to the creek he asked Motern if he was trying to get smart with him and Motern told him an ugly word; when Motern told him that ugly word, the pistol was behind him in both hands, as I saw him when he started up to meet the Mexican boy with the pistol behind him; he had the pistol behind him when he went up to meet the Mexican boy."

There were other witnesses whose testimony would go to show that the deceased had the rifle in appellant's stomach and fired same prior to appellant's shooting the deceased. However, the above quoted testimony only relates to that upon which the State relied for a conviction. Appellant's own testimony would show a shooting in self-defense.

My Brethren have held that the sum total of this testimony leads one to the inescapable conclusion that the uncontradicted facts show a case of perfect self-defense under the law. This can only be true if the facts do show such and if there are no believable facts to the contrary.

The majority opinion herein, I think, has overlooked one legal proposition relative to the right of self-defense. If it is intended to be herein held by the majority that a case of perfect self- defense is presented by the testimony, it occurs to the writer that they must so find in the face of testimony indicating strongly that appellant provoked the occasion for the difficulty, and caused the deceased to attack him, thus producing the occasion to arise where he might take the life of the deceased.

Mr. Branch in his Ann. Penal Code, pp. 1093 and 1094, cites numerous cases laying down the general doctrine that:

"If the difficulty was provoked by defendant with the intent to kill or to inflict serious bodily injury, the homicide is murder, although defendant was forced to kill to save his own life. Green v. State, 12 Texas Crim. App. 449; Thurston v. State, 21 Texas Crim. App. 245; 17 S. W. 474; Thumm v. State, 24 Texas Crim. App. 703, 7 S. W. 236 Jackson v. State, 32 Texas Crim. Rep. 211, 22 S. W. 831; Keeton v. State, 59 Texas Crim. Rep. 316, 128 S. W. 413."

In the case of Keeton v. State, supra, the accused told the deceased that "there was no use in him (the deceased) telling a dirty damn lie," and such was held to be sufficient to take away from Keeton his perfect right of self-defense, and require a charge on provoking the difficulty.

In the case of Coleman v. State, 49 Texas Cr. R. 357, 91 S. W. 783, the accused took the prosecutor apart privately and told him that he was a g - d liar, whereupon the prosecutor struck accused, and such conduct was held to have justified a charge on provoking the difficulty thus taking away accused's perfect right of self-defense.

In the case of Sanders v. State, 83 S. W. 712, the accused called the prosecutrix a red-headed bitch, and she struck him, and this language was held to justify a charge on provoking the difficulty.

In the case of Flewellen v. State, 83 Texas Cr. R. 580, 204 S. W. 657, this court held in a concurring opinion by Judge Davidson that when the accused jumped out of an automobile and told the deceased and a woman companion to "run, you s - of b - s," that a charge on a provocation of the difficulty was properly given.

In the late case of Norwood v. State, 120 S. W. (2d) 806, 135 Texas Cr. R. 406, where the facts show that the deceased and accused had had some words out on a ranch some hours previous to the killing, and the further fact that accused had driven his car up behind that of the deceased, blocking deceased's path to back his car out from on a public street in the city of Burnet, and upon accused's request to deceased's uncle to come and talk with the accused,—it was held that such constituted a basis for a charge on provoking the difficulty, and thus limited accused's perfect right of self-defense.

In the present case the State's testimony relied upon for a conviction shows that these negroes were going in bathing near the deceased's father's house; appellant had just passed such house, and had some trouble with a dog, throwing rocks at the dog; that deceased told the negroes, in substance, not to go in bathing down there; that appellant told deceased "to go to hell" and used an insulting epithet to him; that at such time appellant had a pistol in his hands behind his back and began walking to meet the deceased, who had a rifle in his hand. The insulting language had the effect, as such usually does, in causing the deceased to possess himself of a weapon, and thus provoked the difficulty. There is sufficient evidence to support the State's theory that there was but one shot fired, two witnesses swearing they heard only one shot, and the owner of the gun testifying that there were no shells in the gun, either loaded or unloaded ones; that when same was taken from the water there were no shells in the gun. There is also testimony of Sheriff Robey that appellant was not shot in the hand as he claimed to have been, but had a mere scratch thereon.

Under these circumstances I am not willing to say that as a matter of law these facts make a case of perfect self-defense. There is sufficient testimony upon which the jury could have and doubtless did predicate their verdict of guilt. If the facts as related by appellant were undisputed, and with no provocation upon his part, I think my Brethren would be correct, but there were further and controverting facts upon which the jury have passed, and I therefore dissent from the opinion reversing this cause.